SUSAN M. CHEHARDY, Judge.
 

 |?.This is a divorce proceeding in which the parties each sought use of the family home, child custody, and child support. The plaintiff, the father, also sought spousal support. The trial court ruled in favor of the defendant, the mother, granting her use of the family home and domiciliary custody of the children, and denied the father’s request for spousal support. The father appeals. We affirm.
 

 FACTS
 

 Larry Romel Robertson and Tonya Thomas Robertson were married in November 1998 and established their domicile in Luling in St. Charles Parish. Three children were born of the marriage: a girl, B.R. (born November 17, 2000); two boys, C.R. (born July 14, 2005), and J.R. (born April 7, 2008).
 
 [1]
 

 On January 29, 2010, Larry Robertson filed a petition for divorce pursuant to La. C.C. Art. 102. He alleged he desired a divorce because he had been “kicked out” of the family home by the defendant some four months previously. He alleged that although he left against his will, he continued to take the children to school and to pick them up from school every day, and that he frequently cared for them on weekends. He alleged that prior to being kicked out, he stayed home and took care
 
 *356
 
 of the children exclusively for at least 18 months. He alleged that he is |sfree from fault and that Tonya Robertson is verbally abusive to him. He stated that Tonya Robertson works two jobs, is gone constantly, and travels out of town without petitioner or the children. He sought to be granted joint custody of the children and to be named domiciliary parent, to be granted exclusive use of the family home, and to be awarded child support and spousal support.
 

 Tonya Robertson made a reconventional demand for an Article 102 divorce. She sought primary domiciliary custody of the children, exclusive use and occupancy of the family home, and to be granted child support pursuant to the guidelines.
 

 The matters of custody, support, and use of the family home were tried on June 21, 2010. At the hearing, Tonya Robertson testified she lives in the family home with her three children and her mother, who helps her with the children. Tonya is a pharmacist employed by CVS. Her job title is pharmacist-in-charge, which requires her to travel occasionally to other CVS locations. She earns $56 an hour with CVS. She also works a second job as a contract pharmacist at a methadone treatment center in Baton Rouge, owned by the CRC Group, where she earns $47 an hour.
 

 Tonya testified that her husband, Larry Robertson, is “lazy” because “he worked a little bit,” but she had to push him for everything. She had to wake him up in the morning, she took care of all the bills, and when she came home after working 14 hours, she would have to bathe the children and iron clothes. She said he stayed in bed all day, then when he heard her car pull up in the driveway he would rush to wash dishes and do housework. She testified she considered him an “okay” father but not a “good” father, because he waited for her to do everything for the children, instead of caring for them himself.
 

 LTonya acknowledged that Larry would run errands during the day involving business that affected both of them, such as going to the bank. She said he repeatedly lost jobs because he was frequently late for work. She said he had not worked for two years at the time of the hearing because his driver’s license was expired.
 

 Tonya denied that Larry took care of the children regularly; she said that when he picked them up after school, he would bring them to her mother to care for them. He would drop them off at school in the morning when Tonya had to get to her alternative job, but she was working at CVS — at a store near their home — she dropped off the children at school. She said that often when she got home from work late at night after working long hours, she would find the children still awake and hungry, while Larry would be sleeping.
 

 She admitted that for part of the time they had only one working vehicle, and he would drive her to work and the kids to school.
 

 Tonya testified that sometimes when she had to work out of town, Larry and the children would come also and stay with her at a hotel. She stated that since their separation, she had asked Larry to allow her to bring their daughter on a vacation out of the country, but he refused to approve the child’s going unless he could go on the vacation also.
 

 Tonya identified copies of her W-2 forms for 2009, which showed that her earnings from the CRC Group were $69,729.00, and her earnings from CVS were $185,388.00. She stated that despite the amount of her earnings, they struggled financially because they owe a lot of money to the Internal Revenue Service. Asked
 
 *357
 
 whether she had given any money to Larry since they separated, she said he had withdrawn money from their joint account, while she had kept up with their [5debts, including payments to the IRS, the children’s school tuition and daycare costs, as well as food, clothing, etc. She had given Larry money for car repairs.
 

 Tonya admitted that Larry had been unable to get a job as a truck driver, his former occupation, because his license was suspended due to their owing money to the IRS.
 

 Tonya also testified to several incidents of domestic violence, in which Larry threatened her with weapons or with physical harassment. She did not call police, however.
 

 Tonya said that when Larry was still living in the family home, sometimes after he picked up the kids from school, he would bring them to her mother’s house for her mother to watch. He did that despite the fact that her mother had been working all day, while he had not been working. In addition, he would wait until Tonya got home from work late at night before doing housework and laundry. The last year he lived in the home and was bringing the kids to school, their daughter was tardy over 63 times. After Larry left and the children were being brought to school by Tonya, the children were tardy only once.
 

 Tonya testified further that since leaving the family home, Larry has been living in his father’s home in Marrero. His sister and her daughter also live there. Tonya stated that the family home in Luling is her separate property.
 

 Charlene Pierce testified she works as housekeeper for Tonya Robertson on an every-other-week basis. She had worked there on a weekly basis from 2008 until the fall of 2009. When she went to the house, she would observe the children were running around unattended, the baby’s diaper would be wet, and the children had not been fed. Tonya was at work most of the time. Larry would be in the bedroom. His daughter told Pierce that her father was sleeping. Pierce never went into the bedroom. Pierce said sometimes she was there for two hours before seeing |r,Larry. Pierce said she “slowed down” from going there because she didn’t want to be a child care provider. She talked to Tonya about the situation, but it really didn’t change much.
 

 Pierce said she observed Larry spanking the oldest child, B.R., for not tending to the younger children, although “she’s only a child herself.” It occurred often enough that Pierce spoke to Tonya about it.
 

 Pierce said her duties include sweeping, mopping, cleaning the children’s room, dusting, cleaning windows. She did more than she was supposed to do as a housekeeper, because she changed diapers, dressed the children, cooked breakfast for them. It’s not her job to tend to their children, she said.
 

 Christy Hawxhurst, sister of Larry Robertson, testified she frequently visited the Robertson home when her brother was still living there. She said he and his wife had a role reversal, in that Larry was the homemaker and took care of the children. She denied that he was lazy, and said he is sad at being unemployed for so long, because he was very good at his job as a truck driver. He lost his truck-driver license, however, due to the tax problems, and so could not work as a truck driver.
 

 Hawxhurst stated she used to go over in the afternoons three or four times a week. She said that Larry was good with his children and his children loved him. Hawxhurst testified Tonya was never home when Hawxhurst went over because Tonya was “always working.” Hawxhurst
 
 *358
 
 said she often stayed through the evening until Tonya came home at around 10:80 p.m. She testified she had tried to demonstrate to her brother how to clean house.
 

 Tonya Robertson, recalled to the stand, contradicted Hawxhurst’s testimony, saying she doubted her sister-in-law had come to their home three or four times a week because “Christy works a lot, just like me.” Maybe she would come over 17when she wasn’t working. When Christy came over it was late at night. Tonya knew her sister-in-law came because sometimes Christy was still there when Tonya arrived home, and Christy would offer her food that she had cooked.
 

 Debra Woods Thomas, Tonya Robertson’s mother, testified she moved into the Robertson home after Larry left, to help her daughter with the children. She has a home of her own, but is staying full time with her daughter for as long as she is needed. She works in the St. Charles Parish school system during the school year as a day care assistant.
 

 Thomas testified she began taking the children to school after Larry refused to bring them. Larry would only bring the children to school if they called him and asked him for help. Thomas had to dress the children for school and sometimes Larry would be late picking them up, which made her late for her own job.
 

 Thomas stated that while Larry was still living in the home, she helped with her grandchildren at least three or four days a week and every weekend. She did that since the oldest child was born. After Thomas got off work, Larry would bring the children to her. She helped them with homework, she bathed them, and she kept them. He would come back and get them when Tonya got off work. After a while, Thomas said, she told her daughter that since she had to get up at five in the morning to go to work every day, she didn’t feel she should continue watching the kids when Larry was not working. Thomas said he would bring them to her every Saturday morning at 8:00 and pick them up at 8:00 p.m. every Saturday evening, until she stopped keeping them.
 

 Thomas said her daughter has always been a caring and devoted mother who really wants to spend more time with her children, but she has to work because of the financial situation she’s in. Thomas also described an incident when the family were all traveling together in Puerto Rico, in which Larry kicked the older boy — [who8 was four at the time — because the child had kicked his sister. Thomas said that when she intervened, telling her daughter to stop him, he walked up to Thomas and put his hands in her face, telling her, “I could have killed you. You don’t tell me what to do with my children.” Thomas said she grabbed him by the chain and her nails scratched him.
 

 Thomas described another incident in which Larry grabbed the little boy by the shirt and “threw him across the room.” She said that on Christmas Day 2009, Larry came over to spend time with the children. He and Tonya got into an argument, and in front of the children, Larry grabbed a knife and threatened to kill himself, saying, “I’m going to kill myself. If I can’t have you, I’m going to kill myself.”
 

 Thomas testified to another incident in which Larry picked up the daughter, B.R., from school despite Tonya’s instruction that he was not to take the child, and then went to the middle child’s nursery school. At both schools Larry had confrontations with the school staff members over whether he was authorized to take the children.
 

 Larry Robertson testified he was put out of the family home by his wife, Tonya. He has been unemployed for three years.
 
 *359
 
 He formerly worked as an over-the-road truck driver. After losing his job, he began trying to take care of the household, care for the children, whatever a normal father does. He testified that after he stopped working he would give the children breakfast in the morning and dinner in the evening, bathe them at night, get them ready for school in the morning, take them to doctor’s appointments. He denied that his mother-in-law ever took the children to doctor’s appointments.
 

 Larry also testified that when he was still in the family home, he would take care of his wife when she came home from work by having the computer ready to |flreplay her soap operas, and he would have a bath prepared for her. He said the children would usually be watching TV when their mother arrived home, or the younger ones would have gone to sleep and the older child, the daughter, would still be awake.
 

 Larry testified he lives in his father’s home, and when his children visit him they stay there in an extra bedroom. If he were to be made domiciliary parent, he said, he would try to get adequate housing for him and the children. Asked how he would pay for it, he said he is seeking employment. He named several places where he had applied since being put out of the house in October 2009. He said he continues to put in applications, and has been offered a job by BP Oil, pending a background check.
 

 Asked about the tax debt owed to IRS, Larry was uncertain of the amount, and admitted he had not attended the last minute meeting with their tax advocate because he “wasn’t made aware of it.”
 

 Questioned about an incident at the nursery school where his son went, he said he went there not to pick up his children, but to visit a friend who worked there, Vanessa Pierce. He had told his wife he was going to be taking their daughter from school that day to spend the day with her and shop for her dance revue, because there was early dismissal. He phoned his wife after he had picked the child up, but his wife told him she had someone coming to pick up the child.
 

 He stated his driver’s license was suspended for three years, but as of the time of trial it had been reinstated. Two years of the suspension were for non-payment of state taxes, with an additional year for driving while the license was suspended. There may have been some traffic tickets involved, too.
 

 Larry denied that he ever threatened to commit suicide in front of the children, and denied he ever threatened not to return the children to Tonya. He | instated he had not been treated for depression, and had not been to a counselor. He admitted that he sometimes used to leave the baby in his car seat for a long time, to keep him from crawling off the bed. He denied that he ever threw his child across the room (as described by his mother-in-law), and denied that he ever kicked the child. He denied that he ever spanked his daughter or every touched her physically to discipline her.
 

 He admitted that he would usually be sleeping when the housekeeper came over. He said he would “doze off,” because he was doing work at night — laundry, or taking care of the baby if the baby was sick. Asked why he didn’t do laundry during the day, he said that when they had only one car, he was busy in the days chauffeuring his wife to and from work, driving the kids around, doing errands. Sometimes during the day he would work on something around the house that needed repairs, such as the plumbing, the water treatment system, the air conditioner, the electrical system.
 

 
 *360
 
 The trial court rendered its judgment on June 22, 2010. The court awarded custody of the children jointly to both parents, with Tonya Robertson designated as the primary domiciliary parent, set out a schedule for visitation and holiday custody, granted Tonya Robertson use.and possession of the family home, and set rules for other matters such as providing clothing and transportation for the children for visitation. The judgment did not mention child support or spousal support, and specifically stated, “[A]ny relief requested by either of the parties and heard on the above hearing date and not specifically addressed herein be and is hereby denied.”
 

 In Reasons for Judgment, the court found there is “a great disparity between the abilities and skills of the parties to manage the household, care for the children, and provide for the children.” The court stated:
 

 In Basically, the mother has exhibited all of the skills necessary to raise children. She is a hard worker who makes a substantial salary as a pharmacist for CVS. In spite of her workload with CVS, the mother has been required to be primary caregiver in the children’s lives. The proof the mother adduced with respect to the father’s shortcomings in caring for the children was a strong statement of the father’s inability and/or lack of desire to be a primary caregiver for the children.
 

 * * *
 

 The fact that the father has shirked his responsibility towards his children on a consistent basis thwarts this process. The fact that the parties have gotten themselves into a huge financial bind (by being overextended in their finances and owing so much money to the IRS) forces the mother to work long hours, depriving the children of quality time with their mother.
 

 The mother’s current arrangement and plans for providing for the children are in the best interests of the children. Their maternal grandmother is a positive force in their life. The structure that the mother and grandmother bring to the children’s lives bodes well for the children’s future. The father’s assertions that he couldn’t work for the past three years and his assertions of being a good parent while he was at home during those three years were not corroborated by the evidence and were, quite candidly, not believed by this court.
 

 All things considered, the Court finds that current living arrangements are in the best interests of the children and will make them the judgment of this court.
 

 [[Image here]]
 

 In light of the Court’s ruling on custody, the requests by Mr. Robertson for child support and use of the family home are moot. However, he has also requested spousal support....
 

 The Court cannot understand how an able-bodied man who is in great physical shape and is in the prime of his life doesn’t have a job. A marriage is not a meal ticket. It seems that all of the financial responsibilities in the marriage have been on the wife. This is untenable.
 

 Rather than give spousal support herein, the Court will give Mr. Robertson practical advice: get a job. This request will be denied.
 

 Larry Robertson filed a timely devolu-tive appeal. On appeal he assigns the following errors:
 

 |12(1) The trial court erred in failing to award interim spousal support to Larry Robertson;
 

 (2) The trial court erred in not naming Larry Robertson primary custodian
 
 *361
 
 of his minor children, with reasonable -visitation to Tonya Robinson;
 

 (3) The trial court erred in not granting Larry Robertson’s request for child support for his minor children.
 

 LAW AND ANALYSIS
 

 Interim Spousal Support
 

 Larry Robertson asserts the trial court’s ruling and reasoning for denial of his request for interim spousal support is clearly wrong and constitutes legal error. He argues he is now and has been unemployed for several years; his field of training (truck driving) is not available to him due to his license suspension for non-payment of taxes; he has remained unemployed due to tough economic times. He contends he has established he is in need of support through his own testimony and through his wife’s testimony. He states that Tonya earns over $18,000 per month and, despite her payments to the IRS and other household expenses, she still has the ability to pay spousal support to Larry. He contends the trial court’s inconsistency in its application of the law dictates a
 
 de novo
 
 review.
 

 LSA-C.C. art. 98 provides that married persons owe each other fidelity, support, and assistance. A spouse’s right to claim interim spousal support is based on this statutorily-imposed duty of spouses to support each other during marriage. Comment (e) to LSA-C.C. art. 98 explains that the spouses’ duties under this article, as a general rule, are matters of public order from which they may not derogate by contract.
 

 Interim spousal support is designed to assist the claimant in sustaining the same style or standard of living that he or she enjoyed while residing with the other 113spouse, pending the litigation of the divorce. The purpose of interim spousal support is to maintain the status quo without unnecessary economic dislocation until a final determination of support can be made and until a period of time for adjustment elapses that does not exceed, as a general rule, 180 days after the judgment of divorce. The court may award an interim spousal support allowance to a spouse based on the needs of that spouse, the ability of the other spouse to pay, and the standard of living of the spouses during the marriage. [Citations omitted.]
 

 Hall v. Hall,
 
 08-706, p. 4 (La.App. 5 Cir. 2/10/09), 4 So.3d 254, 257,
 
 writ denied,
 
 2009-0812 (La.5/29/09), 9 So.3d 166.
 

 In order to demonstrate need for interim periodic spousal support, the claimant spouse has the burden of proving that [he] lacks sufficient income to maintain the standard of living that [he] enjoyed while residing with [his] spouse.
 
 Carmouche v. Carmouche,
 
 03-1106, p. 6 (La.App. 5 Cir. 2/23/04), 869 So.2d 224, 227.
 

 The court shall consider a party’s earning capacity in light of all of the circumstances. Voluntary unemployment is a question of good faith on the part of the obligor spouse. The trial court’s finding as to whether the obligor spouse is in good faith is a factual determination which will not be disturbed on appeal absent an abuse of the court’s wide discretion. [Citations omitted.]
 

 Bagwell v. Bagwell,
 
 35,728, pp. 16-17 (La.App. 2 Cir. 3/8/02), 812 So.2d 854, 866.
 

 We find no merit to Larry’s request for interim spousal support. He failed to submit proof of his expenses and needs. He is living in his father’s home, apparently without cost. Further, as pointed out by the trial court, Larry failed to prove he cannot find work. His testimony as to his job search was vague, although he did state he had been offered a job that was
 
 *362
 
 dependent on a favorable background check.
 

 |14On the showing made, we find no abuse of discretion in the trial court’s denial of Larry’s claim for interim spousal support.
 

 Child Custody
 

 Larry contends the trial court’s denial of his request to be domiciliary custodial parent was manifestly erroneous. He asserts that Tonya “rarely interacts with the children” because she works 60 to 80 hours per week, sometimes leaving home before 8:00 a.m. and not returning until after 10:80 p.m. He states that when she returns home, in addition to the cleaning she testified she does, she watches soap operas. Further, she works most weekends. He argues this leaves Tonya very little time for her to be attentive to the children’s needs.
 

 Larry cites his own testimony that he was the person primarily taking care of his children, bringing them to and picking them up from school, bring the daughter to her dance classes, and taking the children to doctor appointments or to the hospital when necessary. He asserts that Tonya never took them to doctor appointments, and that Tonya’s mother, Debra Thomas, took the older boy to the doctor only once, when he had an asthma attack.
 

 With respect to the repeated tardiness of his daughter when he was taking her to school, he points to his testimony that often they were only two or three minutes late, and that Tonya sometimes took the children to school when she was working at the CVS near their home. He contends there is no evidence as to what portion of the tardy days are attributable to him and what portion to Tonya.
 

 Larry also cites the testimony of his sister, Christy Hawxhurst, that he was good with his children and that he would clean the house when he was there. Larry also cited photographs he placed in evidence showing the house was in disarray and untidy after he moved out.
 

 11sIn a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interest of the child. La. C.C. art. 131.
 

 La. C.C. art. 134 sets out 12 non-exclusive factors for the court to consider in awarding custody:
 

 The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
 

 (1) The love, affection, and other emotional ties between each party and the child.
 

 (2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
 

 (3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
 

 (4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
 

 (5) The permanence, as a family unit, of the existing or proposed custodial, home or homes.
 

 (6) The moral fitness of each party, insofar as it affects the welfare of the child.
 

 (7) The mental and physical health of each party.
 

 (8) The home, school, and community history of the child.
 

 (9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
 

 
 *363
 
 (10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
 

 (11) The distance between the respective residences of the parties.
 

 (12) The responsibility for the care and rearing of the child previously exercised by each party.
 

 The trial court is not bound to make a mechanical evaluation of all of the statutory factors listed in La. C.C. art. 134, but should decide each case on its own facts in light of those factors.
 
 Robert v. Robert,
 
 44,528, p. 2 (La.App. 2 Cir. 8/19/09), 17 So.3d 1050, 1052,
 
 writ denied,
 
 2009-2036 (La.10/7/09), 19 So.3d 1. These factors are not exclusive, but are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court.
 
 Id.,
 
 44,528 at p. 3,17 So.3d at 1052.
 

 Each child custody case must be viewed in light of its own particular set of facts and circumstances with the paramount goal of reaching a decision that is in the best interest of the children. On appellate review, the determination of the trial court in establishing custody is entitled to great weight and will not be disturbed absent a clear showing of an abuse of discretion. [Citations omitted.]
 

 Bridges v. Bridges,
 
 09-742, p. 6 (La.App. 5 Cir. 2/9/10), 33 So.3d 914, 918.
 

 We find no manifest error in the trial court’s factual determination that the best interest of the children is to have their mother as domiciliary custodian. Larry Robertson’s testimony was directly contradicted in many respects by the testimony of Tonya Robertson and her witnesses. The trial judge stated emphatically that he did not find Larry believable. The testimony concerning Larry’s belated actions in caring for his children, and in particular the testimony regarding his temper and actions he took when angry, convince us the trial court was correct in its ruling that denied Larry primary domiciliary custody of the children.
 

 Child Support
 

 Larry asserts that if this Court determines that he is entitled to be named the primary custodian or to have shared custody with Tonya, then he is entitled to an 117award of child support calculated based on minimum wage for his and $17,000 per month income for Tonya.
 

 Because we have affirmed the trial court’s decision denying domiciliary custody and shared custody to Larry, we pre-termit consideration of this assignment.
 

 DECREE
 

 For the foregoing reasons, the judgment is affirmed. Costs of this appeal are assessed against the appellant, Larry Robertson.
 

 AFFIRMED
 

 [1]
 

 . We designate the children by initials to protect their privacy.
 
 See
 
 La. S.Ct. Rules, Rule XXXII, section 3.