JUDE G. GRAVOIS, Judge.
|2This appeal involves the custody of an orphaned child, M.S.E.[1] His maternal grandfather petitioned the court for custody. His paternal uncle and aunt also jointly petitioned the court for custody. After much discovery and a two-day trial, custody was awarded to the paternal uncle and aunt. For the reasons that follow, we affirm.

PROCEDURAL BACKGROUND AND FACTS

Michael Evans, II (“Mikey”) and Melissa Hebert (“Missy”) were married on July 6, 2004. At that time, Mikey was on active duty with the Louisiana National Guard. *329 Missy became pregnant shortly before Mi-key was deployed to Iraq. Tragically, Mi-key was killed in Iraq on January 28, 2005. Their son, M.S.E., was born on June 7, 2005. On February 20, 2011, Missy took her own life.
Dennis Hebert (“Mr. Hebert”), Missy’s father, filed a petition seeking custody of M.S.E. and was granted temporary custody of M.S.E. pending a | .-¡determination of permanent custody. Davin Evans, Mi-key’s older brother, and his wife, Heather (“the Evanses”), also filed a petition seeking custody of M.S.E.[2] An attorney was appointed to represent the minor child, and a custody evaluation was ordered to be performed by James Klein, Ph.D. Dr. Klein eventually issued a report recommending that M.S.E. remain in the custody of Mr. Hebert. After several delays, the matter finally proceeded to trial on May 7-8, 2012.
At trial, thirty-six year old Davin Evans testified that he and his thirty-two year old wife Heather had been married for thirteen years and had two sons, ages 5 and 10. Both Davin and Heather are employed by the U.S. Department of Defense as information security specialists, having a combined annual income of approximately $155,000. In connection with their jobs, the Evanses have been granted high level security clearances. The Evans family resides in Chesapeake, Virginia, in a two-story house surrounded by neighbors with young children. Pictures of their home introduced into evidence show it to be comfortably furnished with a fenced-in yard containing play equipment. Other family members, with whom they enjoy outings, including camping, boating, fishing, and swimming, live nearby. The Ev-anses’ oldest child attends public school, which is reportedly part of one of the best public school systems in the nation.[3] Mr. Evans testified, however, that although he and his wife are not Catholic, they would be willing to send M.S.E. to Catholic schools, since he was enrolled in a local Catholic school at the time of trial. In the event they would receive custody of M.S.E. and send him to a Catholic school, they had looked into possibly sending their two sons to the same school. If custody of M.S.E. were granted to them, they would strive to maintain and continue the relationship M.S.E. has had with his grandfather, Mr. Hebert.
|4Mr. Evans testified that he did not meet Missy until Mikejfs funeral. He remained in close contact with her until the time of her death. She and M.S.E. stayed with him and his wife in Virginia after Hurricane Katrina. Further, Missy and M.S.E. had visited them several times in Virginia. He and Missy even discussed the possibility of her and M.S.E. moving to Virginia. While Mr. Evans admitted that he did not see or talk to M.S.E. on a daily or weekly basis, M.S.E. did spend ten days with his family during the summer of 2011. M.S.E. got along well with his sons and they all enjoyed family visits to a nearby lake. Pictures of these visits to the lake were also introduced into evidence. Mr. Evans stated that he sold his boat to help finance the cost of this custody proceeding. All of his vacation days and sick leave days had been used for trips related to the custody evaluation and proceedings.
Heather Evans’ testimony corroborated that of her husband. Although she did not have as close of a relationship with Missy as her husband did, she did speak to her at times regarding child-rearing practices. *330 She had not been able to visit with M.S.E. on a regular basis, mainly because of her family and employment responsibilities. She called to speak to M.S.E. on several occasions, but he did not want to talk on the phone; rather, he would not respond or other times would just “scream.” She occasionally spoke to Mr. Hebert regarding M.S.E.’s well-being, and he would always tell her that M.S.E. was doing “fine.” Once the custody proceeding was initiated, the interaction between her and her husband and Mr. Hebert was “fairly uncomfortable,” it being apparent to her and her husband that Mr. Hebert was angry at them. If she and her husband were to obtain custody of M.S.E., they would place pictures of Mr. Hebert around their home, and would look into using Skype, an Internet communications network, for communicating with Mr. Hebert. She has a friend whose father is a Catholic deacon and she has | sspoken to him about the Catholic faith and what would be required to raise M.S.E. in the Catholic faith. If she and her husband were to obtain custody of M.S.E., he would share a bedroom with their younger son. They have looked into purchasing a four-bedroom home, but have yet not found “the right one.” She testified as to their family routines, such as eating dinner together every night and the rules for watching television and using the computer. She testified that she had reviewed all of the documents that had been presented to them as part of this proceeding concerning M.S.E., including his school records. She was aware that there were some behavior issues regarding M.S.E. She and her husband had spoken to a friend who is a child psychologist regarding these issues and what would be required to help M.S.E. deal with them.
Mrs. Evans testified that they had picked up M.S.E. the night before the trial began and took him to a children’s-themed restaurant and to view airplanes at the local National Guard airbase. M.S.E. exhibited no anxiety whatsoever being with them and was anxious to leave with them when they arrived to pick him up.
Mr. Hebert testified that he was born in June of 1950. He worked for the U.S. Postal Service for approximately thirty years. Twenty-eight of those years were spent working the night shift. He was married to Missy’s mother, Debra, from 1981 until 1990. When he married Debra, she had a young daughter, Shawn, whom Mr. Hebert adopted when she was ten. Missy, who was born in 1982, was their only child together.
Mr. Hebert testified that in 1985, Shawn told a school counselor that she had been sexually molested by an uncle. Mr. Hebert and his wife did not believe Shawn. She ran away from home several times. The Office of Family Services (“OCS”) received a report from a neighbor that Shawn was being physically abused. OCS began an investigation and ultimately Shawn was removed from the | (¡Hebert home. In due course, the He-berts relinquished custody of Shawn and she remained in foster care until she was emancipated at the age of seventeen. Mr. Hebert denied knowledge that his wife was physically abusing Shawn. He testified that this was a very traumatic time for the family and he did not recall many of the specifics surrounding Shawn’s removal from the home or his contact with Shawn after her removal. Mr. Hebert denied knowledge that his wife had told OCS that their lives were much calmer with Shawn out of the home and they did not want to work to have her return to their home.
It was evident at the time of trial that Mr. Hebert and Shawn resumed their relationship at some point. Shawn lives in the *331 New Orleans area and has three children, ages 16,19 and 20.
Mr. Hebert testified that when he and Debra divorced, he obtained sole custody of Missy. He described in general terms their regular living routine. He would bring Missy to his parents’ house at night for her to sleep and he would pick her up in the morning and bring her to school. Missy graduated from high school in 2000. She continued to live with Mr. Hebert after graduation. She briefly attended Delgado Community College in New Orleans and had a series of part-time jobs, but it was generally unclear from Mr. Hebert’s testimony as to what Missy did after graduation from high school until she married Mikey.
Mr. Hebert testified that in 2002, Missy took an overdose of pills in an attempt to commit suicide. She was taken to the hospital and spent a week at a mental health facility. Missy was diagnosed at that time as being “bipolar” and was placed on medication. Approximately one year later, Missy again took an overdose of pills. She was taken to another hospital for a period of time, where her medication was changed.
|7Mr. Hebert testified that a few days after Missy returned from a vácation with friends in July of 2004, she told him she was married. She then handed him the telephone so that he could talk to Mikey, her new husband. Mr. Hebert later found out that Missy had met Mikey in February of 2004 and had gone to Texas on a trip with friends where she and Mikey got married. Mr. Hebert first met Mikey in September 2004 when he stayed with Missy at the Hebert residence while on leave. Shortly after that visit, Mikey went to Iraq and Missy discovered that she was pregnant. Mikey ' came home again around Christmas and was excited about the pregnancy. Mr. Hebert was at home with Missy when two members of the National Guard came to his house and informed them that Mikey had been killed in action. Missy was devastated.
Mr. Hebert was at the hospital when M.S.E. was born and Missy and M.S.E. came home from the hospital to his house. Missy received about $500,000 in solder’s benefits after the death of Mikey. In December 2005, Missy used a portion of this money to purchase and remodel a house in Kenner. After Missy and M.S.E. moved into this house, Mr. Hebert would often pick M.S.E. up from school. Further, M.S.E. often stayed with him on weekends while Missy went out with friends.
Mr. Hebert indicated that Missy was involved with many men following Mikey’s death. A relationship with a man named Patrick became violent one night when Patrick assaulted Missy and held a knife to her throat; this attack purportedly occurred in front of M.S.E. Mr. Hebert’s testimony indicates that Missy summoned Mikey’s mother after this incident, and soon thereafter, Missy and M.S.E. relocated to Florida and lived with Mikey’s family for several months. In the fall of 2008, Missy began a relationship with A.J., whom she had dated before she married Mikey. In due course, Missy returned to Louisiana and moved into |8A.J.’s home. She paid for a swimming pool which was installed at A.J.’s home. This relationship between Missy and A.J. soon ended, with Missy moving back into her Kenner home.
Mr. Hebert testified that just prior to Missy death, Missy’s friends and Shawn told him of things that Missy posted on Faeebook, an Internet social networking service, apparently indicating that she had no money and was considering harming herself. He spoke to Missy about these things, but Missy told him that she was fine. In January 2011, Mr. Hebert went to Missy’s home and she told him that she *332 had taken a number of sleeping pills. He described Missy as being in “fairly bad condition” and found a couple of empty pill bottles at the home. Mr. Hebert stayed at Missy’s home until “late” that night. He left Missy in the care of a friend, “Kline,” who was a recovering drug addict. Although medical help was not sought that night, Kline took Missy to her treating psychiatrist, Dr. Poole, the next day. Mr. Hebert testified that he called Dr. Poole and spoke to him for about an hour about the Facebook postings and Missy’s overdose of pills. Dr. Poole assured him that Missy was not suicidal. Missy continued under Dr. Poole’s care until she committed suicide in February 2011. At the time of Missy’s death, M.S.E. was with Mr. Hebert.
Mr. Hebert testified that after Missy’s death, his eighty-eight year old mother moved into his home with him and M.S.E. At that time, he was still working nights shifts for the Postal Service, but retired in June 2011. M.S.E. has his own room at the Hebert house, along with a computer and video games. Pictures of the home introduced into evidence depicted a swing set in the back yard, which Mr. Hebert admitted he had recently purchased at the suggestion of his attorney. He testified that he was not concerned about his age (sixty-one at the time of trial) as being an impediment to raising M.S.E. His daughter Shawn comes [ nover to take M.S.E. to the zoo, the park, and movies. In his view, his mother and Shawn are “maternal figures” for M.S.E. Mr. Hebert testified that he is financially able to meet the obligations of raising M.S.E., explaining that he gets an annual pension of approximately $33,000 and will be getting an additional $3,000 per year in social security benefits when he turns sixty-two. He further testified that he had paid M.S.E.’s school tuition and that M.S.E. had been offered a scholarship to a local Catholic school from seventh through twelfth grades as long as he keeps his grades up. He takes M.S.E. to mass on Sundays. He has set up a schedule for M.S.E. to follow after school in order to get him to bed on time.
Mr. Hebert testified that prior to Missy’s death, he was not involved with assisting Missy regarding where M.S.E. would attend school and matters concerning his healthcare. M.S.E. continued at the same school after Missy’s death. He brings M.S.E. to school and picks him up every day. Mr. Hebert testified regarding behavior issues M.S.E. has experienced at school, including striking another student and threatening to kill two students when they tattled on him. He spoke to the school’s counselor and teachers about these incidents. M.S.E. plays with the two children next door and likes to go to the playground to play with other children. M.S.E. has also played on sports teams at the playground.
Although he claims he had not seen any behavior problems in M.S.E., after giving a deposition in this matter, Mr. Hebert started taking M.S.E. to Dr. Vincent Car-bone for counseling. Mr. Hebert stated that he wanted M.S.E. to be comfortable with a counselor in the event that he developed problems later on.
Mr. Hebert testified that when Missy received the large sum of money after Mike/s death, he assisted her with opening an investment account. After Missy’s death, he learned that Missy had spent most of this money. Aside from her | ^purchasing and remodeling of the home in Kenner and her paying for the installation of the pool at A.J.’s house, he was generally unsure of what the money was used for. He later learned that Missy had made numerous ATM cash withdrawals. Missy’s Kenner home has been sold and *333 Mr. Hebert has put the proceeds from the sale into an account for M.S.E.
Mr. Hebert testified that he had no objections to M.S.E. spending extended periods of time with the Evans family, as long as M.S.E. is comfortable with doing so.
Shawn Hebert, Mr. Hebert’s adopted daughter and Missy’s half-sister, testified that although prior to Missy’s death, she only had sporadic visits with M.S.E., she had begun to see him on a more regular basis after Missy’s death. She stated that M.S.E. and Mr. Hebert are extremely close and that he had done a good job of caring for M.S.E. since Missy’s death.
Ms. Hebert testified that she ran away from home due to her mother’s physical abuse and molestation by her uncle. The physical abuse by her mother started before her mother married Mr. Hebert and continued after the marriage; however, Mr. Hebert was not aware of the abuse. She was placed in foster care at the age of twelve and never returned to live with her family. Once she had grown up and was out on her own, Mr. Hebert had “always been there” for her and always made her feel welcome and like she was part of the family.
Evelyn Hebert, Mr. Hebert’s mother, testified that she currently lives with her son, Mr. Hebert. She has various health problems, including diabetes and cancer, as well as a recent stroke, from which she has recovered. Mr. Hebert does the cooking and she cleans the house and does whatever she can to help out. She watches M.S.E. for short periods of time, but never for extended periods.
InWynette Evans, Mikey’s mother, testified that Mikey called her the day he and Missy were married to let her know of the marriage. She and her husband were living in the New Orleans area at the time and they met Missy about a week after she returned to New Orleans after the marriage. She and her husband moved to Jacksonville, Florida, in December 2004. At the time she married her husband, she had two children, Davin and Dana, whom he adopted. She and her husband had two additional children, Mikey and Marybeth.
Mrs. Evans testified that Missy visited with them every week before they moved to Florida. After the move, they often talked on the phone. Missy requested that Mrs. Evans be in the delivery room for the birth of M.S.E., which she attended. When Hurricane Katrina struck in August 2005, Missy and M.S.E. evacuated to Mrs. Evans’ home in Jacksonville and later stayed with Davin and Heather in Virginia.
Mrs. Evans testified that she visited with Missy and M.S.E. quite often and Missy allowed M.S.E. to visit her and her husband alone in Florida. On these occasions, they would meet Missy halfway between New Orleans and Jacksonville to transfer M.S.E.
Mrs. Evans testified that in 2008, Missy called her in the middle of the night and said that her flaneé had attacked her in front of M.S.E. Mrs. Evans immediately drove to New Orleans and brought Missy and M.S.E. to Jacksonville to live with them. Missy and M.S.E. lived with Mrs. Evans and her husband for some time. They later moved into an apartment with Marybeth. At some point, Mrs. Evans spoke to Missy about her concern over Missy’s exposing M.S.E. to various men that she had brought into her home. This angered Missy, prompting her to leave Jacksonville soon afterwards. During this time, Missy “reconnected” with A.J., whom she had dated before she married Mikey, and soon moved in with |12him in Louisiana. A month or so later, Missy wrote to Mrs. Evans and apologized for her actions and their close personal relationship re *334 sumed. Mrs. Evans read a letter into the record from Missy which spoke of the love and high opinion Missy had for the Evans family.
Mrs. Evans testified that she had considered seeking custody of M.S.E. after Missy’s death, but later realized that such was not a good idea, mainly because of her age. She also realized that her household and routine did not include any young children and she could not provide other children for M.S.E. to be raised with. She explained that if M.S.E. were allowed to live with Davin and Heather, he would be part of a family with a mother and father and siblings, and would not be alone in the world.
Mrs. Evans testified that on the night before the trial, she and her family took M.S.E. for an outing and when they brought him back to Mr. Hebert’s house, he stated that he did not want to go home.
Shala Waguespaek testified that she and Missy had been friends since Missy was seven years old. Although Ms. Wagues-pack was ten years older than Missy, they became close friends. Ms. Waguespaek was Missy’s dancing teacher. She stated that Missy had told her on several occasions that if anything ever happened to her, she wanted Mr. Hebert to have primary custody of M.S.E. because he had done a good job of raising her.
Ms. Waguespaek testified that the week before Missy committed suicide, she called Mr. Hebert because she was concerned about the text messages she had received from Missy. In these messages, Missy told Ms. Waguespaek not to be upset if something happened to her.
Dr. Vincent Carbone was accepted by the court as an expert in child psychology. He testified that Mr. Hebert brought M.S.E. to him in June of 2011 |isand told him that M.S.E.’s parents were deceased and he did not see “a great deal of emotion” from M.S.E. Mr. Hebert related to Dr. Carbone that M.S.E. was reluctant to show affection with adults and he was concerned that he was “holding back from dealing with things that had gone on in his life.” Dr. Carbone testified that at the time of trial, he had seen M.S.E. a total of thirty-three sessions and that M.S.E.’s progress had been very slow. He explained that he had not performed any diagnostic testing on M.S.E.; rather, he was engaging M.S.E. in “play therapy.” He attempted to have M.S.E. alone in the therapy sessions, but because this was not working, it was necessary for Mr. Hebert to attend all of the therapy sessions with M.S.E. Dr. Carbone explained that M.S.E. exhibited signs of aggression and he was reluctant to deal with his emotions. M.S.E. had become less resistant over time and was beginning to allow him to work on “some of the feelings.” At the time of trial, Dr. Carbone had diagnosed M.S.E. as having oppositional defiant disorder and anxiety disorder. These diagnoses were based on M.S.E.’s resistance to follow commands and to “almost panic” when he is confronted with something that was uncomfortable to him.
With regards to the relationship between M.S.E. and Mr. Hebert, Dr. Car-bone testified that M.S.E. relies on Mr. Hebert as a parent and that M.S.E. views Mr. Hebert as his father. Dr. Carbone described the interaction between M.S.E. and Mr. Hebert as jovial. He explained that the strong bond between them is evidenced by the fact that M.S.E. wants Mr. Hebert next to him when he becomes anxious during the therapy sessions. Mr. Hebert has been very receptive to his suggestions and follows through with them. Dr. Carbone had no concerns about M.S.E. remaining in Mr. Hebert’s care. Mr. Hebert is the only adult M.S.E. has connected with and trusts. He opined that if M.S.E. *335 were to be taken away from Mr. Hebert’s home, it would be very disruptive psychologically for M.S.E.
|140n cross-examination, Dr. Carbone admitted that he had not read any of the depositions that had been taken in connection with this matter. He admitted that initially he was not told that M.S.E. witnessed the attack on Missy by Patrick. He stated that he became aware of this incident later, but this incident was not reflected in his notes. His impression was that M.S.E. had not actually witnessed the attack. Dr. Carbone further admitted that his notes also did not reflect that M.S.E. had recently been involved in a situation at school in which M.S.E. threatened to kill two children at school who had tattled on him. Dr. Carbone admitted that he had no information regarding M.S.E.’s relationship with the Evans family, explaining that he had not been asked to perform a custody evaluation. Dr. Carbone also testified that he had not performed any testing on Mr. Hebert to determine whether or not he has qualities for proper parenting. He further elaborated that he feels M.S.E. has “some genetic predisposition to some emotional issues.” Dr. Carbone explained that if M.S.E. were to go and live with the Evans family, he would enjoy having the other children around him, but he felt that M.S.E. would have a great deal of trouble trying to understand what had happened and why another parent figure had been taken away from him.
Dr. Alan James Klein, who was accepted by the court as an expert in the field of clinical psychology, testified that he was appointed by the court to perform a custody evaluation in this case. Although he has performed an estimated two hundred custody evaluations, none of them have involved an orphaned child. In order to perform this evaluation, Dr. Klein interviewed Mr. Hebert, M.S.E., and Davin and Heather Evans. He generally likes to see each person three times, but since Mr. & Mrs. Evans lived out of town, he did not have that luxury in this case. He also spoke to Dr. Carbone and one of M.S.E.’s teachers. He performed the Minnesota Multiphasic Personality Inventory (“MMPI”) on Mr. Hebert and on Mr. 11fiand Mrs. Evans. This test is used to determine whether there are any psychological disturbances that would concern him with regards to their being able to parent a young child. Dr. Klein acknowledged that this test does not assess parenting skills or parenting abilities. The results of the MMPI on Mr. Hebert indicated some mild anxiety, and the results of the Evanses’ tests were within the normal range.
Dr. Klein testified that during the process of this evaluation, it became clear to him that Mr. Hebert had been involved in M.S.E.’s life from his early years, while Mr. Evans had been involved with M.S.E. for only a total of approximately forty-five days. He concluded that Mr. Hebert was a secondary attachment figure for M.S.E., with Missy being the primary attachment figure. Dr. Klein testified that M.S.E. had some “fairly significant emotional and social issues.” He opined that if M.S.E. were removed from Mr. Hebert’s home, there is the potential to exacerbate these issues. He concluded that Mr. Hebert was the only person M.S.E. was connected to and it would be devastating to break that connection. He explained that Mr. Hebert was doing an adequate job of parenting M.S.E., although he noted that Mr. Evans was also well equipped to parent M.S.E. Dr. Klein testified that his opinion is bolstered by the testimony of Dr. Carbone in that he explained that Mr. Hebert plays a vital role in meeting M.S.E.’s needs.
On cross-examination, Dr. Klein admitted that he had not performed any testing *336 to determine the parenting skills of Mr. Hebert or the Evanses. In performing the evaluation, Dr. Klein testified that he had spent between two and three hours alone with Mr. Hebert and less than one hour with Mr. Hebert and M.S.E. together, and had spent “up to three hours [alone] with Davin Evans” and only had a “brief observation” of Davin and M.S.E. together. Dr. Klein explained that during the brief observation of Davin.and M.S.E. together, M.S.E. was acting 11fiout and difficult to manage.[4] He admitted, however, that this behavior' was “possibly due to [M.S.E.’s] having been at day camp in the morning, not having had time for lunch, and he was tired.” Dr. Klein did not observe M.S.E. interacting with Heather Evans, as he felt that this was not necessary because he had all of the information he needed to make a recommendation. He spoke to Dr. Carbone regarding M.S.E.’s extended visit with the Evans family and it was reported to him that this had been a pleasant experience for M.S.E. Dr. Klein admitted that there are objective tests available to measure parenting abilities, but he did not use any of these in this case. He stated that the Evans family had a “good environment with two normal healthy children. It seemed like they were doing a good job.” Dr. Klein explained that he was not trying to determine who was going to be the best parent; rather, he was trying to determine M.S.E.’s needs and who would best be able to meet those needs. Dr. Klein opined that Mr. Hebert was able to meet those needs and was meeting them. Dr. Klein admitted that if custody of M.S.E. were to be granted to the Evanses, they would probably do an “adequate job” of meeting M.S.E.’s needs. In Dr. Klein’s view, M.S.E. needs the “continuity of his family situation rather than disrupting the only thing that he knows.” He testified that M.S.E. has a secure attachment to Mr. Hebert, but admitted that if custody were to be granted to the Evanses, over time M.S.E. would get attached to them.
Dr. Klein admitted that he had actually performed ■ an evaluation for OCS when Shawn was removed from the Hebert home, but he had not reviewed the OCS file during the present evaluation, although it was available to him. He stated, however, that Mr. Hebert’s skills as a parenting figure could riot be measured by “what may have happened in a troubled dysfunctional home setting 25 years — 27 years ago.” Dr. Klein opined that M.S.E.’s emotional and social | tissues stem from the kind of parenting he experienced with his mother, rather than from the death and loss of his mother.
Dr. Seth Kunen, who was accepted by the court as an expert in clinical psychology and forensics, testified that he is a board certified child custody evaluator. He explained that he was asked to present his opinion as to the evaluation completed by Dr. Klein, not to make a recommendation on custody. In formulating his opinion, Dr. Kunen had not met with any of the parties, nor had he spoken to Dr. Klein or Dr. Carbone.
Dr. Kunen testified; that the American Psychological Association guidelines state that the MMPI, the test given to the parties by Dr. Klein, provides no assessment of parenting ability. He explained that a custody evaluation is to assess the child’s needs, strengths and weaknesses, as well as the parent’s strengths and weaknesses, and to determine how they fit together. Dr. Kunen stated that there are standard *337 ized tests available to determine these strengths and weaknesses that provide objective results and are combined with the clinical evaluation to determine what the parenting capacities are. Dr. Kunen testified that he would have used the Child Abuse Potential Inventory, the Adult-Adolescent Parenting Inventory, and the Parenting Stress Index in this case. He was critical of the evaluation performed by Dr. Klein due to his failure to use these tests. Dr. Kunen also explained that there are tests available to assess attachment that could have been used in this case. He stated that another way to assess attachment is to spend four hours at a minimum watching the child interact with the individual. He emphasized that is it important to spread these periods of observation weeks apart. With regards to M.S.E.’s attachment to Mr. Hebert (which appears to have been the primary basis for Dr. Klein’s recommendation to maintain custody in Mr. Hebert), Dr. Kunen testified that there was no empirical evidence of this | ^attachment. Dr. Klein’s conclusions as to how much time M.S.E. spent with Mr. Hebert before Missy’s death were based on hearsay. Dr. Kunen testified that he was surprised at Dr. Klein’s recommendation to continue custody with Mr. Hebert, given that the Evanses presented an “ideal home” and Mr. Hebert’s history with his daughters, which was indicative of mal-adoptive parenting. Dr. Kunen testified that Dr. Klein’s conclusion to continue custody with Mr. Hebert was not consistent with the information presented in his report.
Dr. Kunen testified that there are professional guidelines for child custody evaluations, and while these are not required to be followed, one gets the best outcome if the guidelines are followed. He stated that Dr. Klein did not follow these guidelines in his evaluation in this case. Dr. Kunen explained that when these guidelines are not followed, “our own personal opinions, our own biases, our own personal histories can greatly influence our recommendations and hence the need for objective testing.”
Dr. Kunen further testified that Dr. Carbone should not make a recommendation as to custody because he did not evaluate Mr. Hebert or the Evanses. Dr. Kunen testified that there are many tests available that Dr. Carbone could have used to determine exactly what issues M.S.E. is dealing with and to make a diagnosis. Dr. Kunen opined that the aggressive, uncooperative, and defiant behavior described by Dr. Carbone were indicative of depression, yet Dr. Carbone had not performed any tests to determine what the “real issues are.” Dr. Kunen testified that if Dr. Car-bone had only made very little progress with M.S.E. after thirty-three sessions, it was time for a new therapist. Dr. Kunen expressed surprise that the insurance company was continuing to pay for the sessions with Dr. Carbone based on Dr. Car-bone’s trial testimony.
11SAt the conclusion of the trial, the trial judge took the matter under advisement. On May 29, 2012, giving extensive reasons for judgment, the trial court ordered that permanent custody of M.S.E. be awarded to Davin and Heather Evans with liberal visitation privileges in favor of Mr. Hebert. On June 1, 2012, Mr. Hebert filed a motion for a devolutive appeal.

ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, Mr. Hebert argues that the trial court erred in not finding Louisiana Civil Code art. 133 applicable in this case. While acknowledging that Article 133 provides an order of preference in custody proceedings in which non-parents are seeking custody from a parent, appellant argues that the *338 legislative intent of this article is to provide guidance to the court for an order of preference for custodial placement when there is no suitable parent. Article 133 provides that if an award of joint custody or sole custody to either parent would result in harm to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment. Appellant points out that it is undisputed that M.S.E. has been living with appellant since his mother’s death and that he had spent a substantial amount of time with appellant prior to his mother’s death. Appellant argues that no other party in this proceeding has provided a home environment to M.S.E. Appellant contends that the record is replete with examples of his having provided a stable home environment for M.S.E., citing his school record, his relationship with his friends and teacher, his extracurricular activities, and his church attendance.
Counsel for M.S.E. responds that Article 133 is not applicable to this matter because that article applies solely to custody disputes between a parent and a non-parent. The Evanses agree that Article 133 is inapplicable, also arguing that [ 2ftArticle 133 provides that a non-parent shall be awarded custody over a parent only when there is a showing that substantial harm would result to the child. The Evanses further argue that appellant has not provided a wholesome and stable environment for M.S.E., citing appellant’s history of parenting his daughters. Appellees both contend that case law addressing custody disputes between non-parents apply the “best interest of the child” standard.
Our review of the jurisprudence pertinent to this issue indicates that in cases involving an orphaned child, the courts have employed the best interest of the child standard to award custody between two non-parents. Stephens v. Smith, 30,-028 (La.App. 2 Cir. 12/10/97), 704 So.2d 943, 945. We accordingly find this assignment of error to be without merit.

ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, Mr. Hebert argues that the trial court erred in not applying and in wholly disregarding the factors presented in Louisiana Civil Code art. 134. In this assignment, appellant argues that although custody decisions must turn on the best interest of the child, the courts are not permitted to overlook the factors the legislature enacted to guide them or to point to one factor over the others which may favor contrary placement. Appellant contends that the trial court made no mention of his care and upbringing of M.S.E. and the reasons for judgment are silent as to the lack of any significant time spent between M.S.E. and the Evanses, and failed to consider that M.S.E. had little substantial contact with the Evanses since his birth. Appellant then goes through an examination of each factor and concludes that the trial court abandoned Article 134 in reaching its decision.
12iCounsel for M.S.E. responds that the trial court is not required to perform a mechanical evaluation of the statutory factors. She contends that while the trial court did not outline each and every factor in its detailed reasons for judgment, the court addressed findings of fact which are relevant to each of the factors. In its reasons for judgment, the court noted that while it had done a critical review of the facts and that both parties have the capacity to provide a loving home for M.S.E., the court had grave concerns over appellant’s ability to address the challenges M.S.E. will probably face as he grows up. The Evanses agree that the trial court is not required to make a mechanical evaluation *339 of all of the factors listed in Article 134; they argue, however, that the trial court most certainly considered the factors contained in Article 134, in light of its extensive reasons for judgment. They contend that appellant is actually arguing that the Evanses are not entitled to custody because they have not had as much contact with M.S.E. as appellant has had.
Louisiana Civil Code article 134 provides that in- awarding custody, the court shall consider all relevant factors in determining the best interest of the child; these factors may include:
(1) The love, affection, and other emotional ties between each party and the child. ■
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has ' lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
|¾>(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference. ;
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respec- ' tive residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
The trial court is not bound to make a mechanical evaluation of all of the statutory factors listed in Article 134; rather, the court should decide each case on its own facts in light of those factors. Robertson v. Robertson, 10-926 (La.App. 5 Cir. 4/26/11), 64 So.3d 354, 363. The factors listed in Article 134 are not exclusive, but are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court. Id. Every child custody case must be decided in view of its own particular set of facts and circumstances with the paramount goal of reaching a decision that is in the best interest of the child. Id. On appellate review, the determination of the trial court in establishing custody is entitled to great weight and will not be disturbed on appeal absent a clear showing of an abuse of discretion. Id.
In its extensive reasons for judgment, the trial court noted that M.S.E. lived with appellant as an infant, that appellant frequently babysat for M.S.E. after he "and Missy moved into the Kenner home,- and that M.S.E. went to live with appellant following his mother’s death. The court noted that appellant’s adopted daughter, Shawn, was removed from his home following an investigation by OCS and that the Heberts never reunited with this daughter. The court noted that ^following his divorce from Missy’s mother, appellant had sole custody of Missy. *340 As a young adult while living with appellant, Missy developed a mental illness and attempted suicide on two occasions. Appellant seemed to know very little about Missy’s mental illness and how it affected her. Although Missy lived in his home, it was not until after Missy was married that appellant discovered that Missy had met Mikey and had gone to Texas to marry him.
The trial court also noted the unstable life Missy lived following the birth of M.S.E. This included live-in relationships with a number of men and reckless spending of a large sum of money. Although appellant had frequent contact with Missy during this time, his testimony indicated that he was generally unaware of what she was doing. The testimony indicates that when one of these relationships became violent, Missy sought help from Mrs. Evans who lived in Jacksonville, Florida, rather than from appellant who lived nearby. Despite her history of mental illness, including two suicide attempts, when Missy took an overdose of sleeping pills in January 2011, appellant did not immediately seek medical help for her. Reportedly a friend took Missy to her psychiatrist the next day.
The trial court further noted that although appellant has sought counseling for M.S.E., appellant failed to inform this counselor of M.S.E.’s behavioral issues and unsavory incidents at school.
The reasons for judgment indicate that the trial court was fully aware that M.S.E. had spent much more time with appellant than with the Evanses. The trial court noted that M.S.E. had spent an extended stay with the Evans family, as well as having an outing with them the night before trial, and there was no evidence presented that M.S.E. was uncomfortable with the Evanses. Evidence was introduced that the Evans family made efforts to continue to be a part of M.S.E.’s life after the death of his parents. The trial court noted that Davin and Heather | ^Evans had been married for thirteen years, had two young boys, and live in a house and neighborhood geared towards families raising children. The Evans family has frequent contact with other family members who live nearby. The Evans children attend school in a highly regarded public school system, but the Evanses would be willing to send M.S.E. to Catholic schools and to raise him in the Catholic faith, as per the desires of Mr. Hebert. They also indicated that they were aware of M.S.E.’s. behavioral issues, had reviewed his records, and had spoken to a counselor about these issues. They testified that if they obtained custody of M.S.E., they would facilitate a continued relationship between appellant and M.S.E.
The reasons for judgment refer to the testimony of Dr. Carbone that M.S.E. had made little progress in therapy, as he was still defiant, uncooperative, and inattentive. The court noted that Dr. Carbone agreed that these characteristics can result from the child being “poorly disciplined.”
The trial court acknowledged that Dr. Klein, the court-appointed custody evaluator, opined that it was in the best interest of M.S.E. to remain with appellant. The court noted that this opinion was based on Dr. Klein’s belief that M.S.E. is attached to appellant. The court also noted that Dr. Klein met with appellant for approximately three, hours and with Davin Evans for approximately two hours. Although Dr. Klein met with Heather Evans, he did not observe any interaction between her and M.S.E. Further, the court noted that Mi*. Evans had attempted to contact Dr. Klein after M.S.E.’s extended visit, but Dr. Klein did not return his calls. Dr. Klein was aware of appellant’s prior history with OCS and the removal of Shawn from the home, but explained that he did not hold *341 this prior history against appellant. Further, the court noted that Dr. Klein did not perform any tests to measure parenting skills on any of the parties. The court also noted that DrJ^Klein acknowledged that M.S.E. has the capacity to attach to other adults, and that with time, he expected that M.S.E. would attach to the Evanses. Finally, the court noted that Dr. Klein testified that he did not find anything that would prevent the Evanses from providing a loving, caring, and nurturing home for M.S.E.
The reasons for judgment go on to list the factors of Article 134 and states that “after a critical review of the facts presented, and with a concern for [M.S.E.’s] emotional well-being as he grows up[,] the court finds that it is in the best interest of [M.S.E.] that sole custody be awarded to Davin and Heather Evans.” The court stated that it had grave concerns regarding appellant’s parenting abilities to address the challenges M.S.E. will face as he grows up.
The overriding consideration in a child custody case is always the best interest of the child. La. C.C. art. 134. In determining the best interest of the child, there must be a weighing and balancing of factors favoring or opposing custody in the respective competing custodians on the basis of the evidence presented in each particular case. Stephens v. Smith, 30,028 (La.App. 2 Cir. 12/10/97), 704 So.2d 943, 945. Contrary to appellant’s argument, the reasons for judgment indicate that the trial court did consider the factors listed in Article 134 and weighed and balanced the specific facts of this case to determine the best interest of M.S.E. A review of the testimony indicates that although appellant has a strong bond with M.S.E. and has the means to provide for his physical needs, the Evanses can provide an overall better environment to address the issues faced by M.S.E. now and in the future.
After thoroughly reviewing the record before us, we find no abuse of discretion in the trial court’s award of permanent custody of M.S.E. to Davin and Heather Evans. [ ^ASSIGNMENTS OF ERROR NUMBER THREE AND FOUR
In his final assignments of error, Mr. Hebert argues that the trial court erred in completely disregarding the findings and recommendations by Dr. Klein, the court-appointed evaluator, in determining custody of M.S.E. He further argues that the trial court erred in disregarding the psychological damage to M.S.E. as opined by Dr. Klein in determining custody of M.S.E. Because these assignments both relate to the trial court’s consideration of Dr. Klein’s findings and recommendations, we will consider them together.
The long-standing rule of law is that the trial court is not bound by the testimony of an expert; rather, expert testimony is to be weighed the same as any other evidence. McFall v. Armstrong, 10-1041 (La.App. 5 Cir. 9/13/11), 75 So.3d 30, 36. The opinion of any expert may be accepted or rejected in whole or in part by the trial court. Id. The effect and weight accorded to expert testimony is within the broad discretion of the trial court. Id.
First, we find appellant’s argument that the trial court completely disregarded the findings and recommendations by Dr. Klein in determining custody of M.S.E. to be without merit. The reasons for judgment, discussed in detail supra, indicate that the trial court did in fact consider Dr. Klein’s findings and evaluated these findings in light of the other evidence presented to the court. Further, this argument completely ignores the testimony presented by Dr. Kunen, which was very critical of Dr. Klein’s evaluation. Moreover, as *342 stated by the jurisprudence cited above, the trial court was well within its discretion to reject the findings of Dr. Klein.
Appellant is also critical of the .trial court for referring to the OCS investigation which resulted in the removal of Shawn Hebert from the Hebert home, but at the same time ignoring the testimony of Shawn herself, the subject of 127this investigation. Appellant points out that Shawn testified that her mother had abused her and she had hid this from appellant. Our review of the testimony presented at trial indicates that Shawn did testify that her mother had abused her and that appellant was unaware of this abuse. However, Dr. Klein’s report clearly states that appellant also struck Shawn. Appellant contends that the testimony indicates that following Shawn’s removal from the home, appellant continued to attempt to contact her. Our review of the testimony indicates that appellant could not recall many specifics regarding his contact with Shawn after she was removed from the home. The record was also unclear as to when or how the reconciliation between Shawn and appellant actually took place, but it was clear that this reconciliation took place after Shawn reached the age of majority. Thus, this argument is likewise without merit.
Appellant further argues that the trial court failed to consider the psychological damage to M.S.E. if custody is transferred to the Evanses, as testified to by Dr. Klein and Dr. Carbone. A reading of the trial court’s reasons for judgment indicates that the trial court did consider the testimony regarding this issue. In his reasons for judgment, the court stated: “While there are legitimate concerns for removing [M.S.E.] from his grandfather’s house, Dr. Klein indicates that the Evans’ (sic) have the capacity to provide the necessary emotional support to make this transition as smooth as possible. Further, Dr. Klein testified that with time, [M.S.E.] has the capacity to bond with and attach to other adults.”
As with the testimony of Dr. Klein, the weight' to be given to the testimony of Dr. Carbone was within the sound discretion of the trial court. In its reasons for judgment, with regard to the testimony of Dr. Carbone, the trial court noted that absent from Dr. Carbone’s notes were significant events in M.S.E.’s life, including M.S.E.’s witnessing of the attack on his mother and M.S.E.’s threatening to kill |2Stwo children at school. Additionally, Dr. Carbone testified that he had no information regarding the Evans family. Further, Dr. Kunen was critical of Dr. Carbone’s treatment of M.S.E., explaining that Dr. Carbone had not performed the necessary testing on M.S.E. to reach a diagnosis, and that M.S.E.’s lack of progress in therapy indicates M.S.E.’s need for a different therapist.
These assignments of error are likewise without merit.

CONCLUSION

While it is very unfortunate that M.S.E. has lost both of his parents at such a young age, he is very fortunate to have these adults in his life who love him very much and are willing to make numerous sacrifices for his well-being. The record is clear that Mr. Hebert has a tremendous love and strong bond with M.S.E. This transfer of custody does not remove Mr. Hebert from M.S.E.’s life; rather, the trial court’s decision provides M.S.E. with a structured environment consisting of two parental figures and two siblings in a setting geared towards young children, with the added benefit of liberal visitation privileges reserved to a loving grandfather. Having found that the trial court did not abuse its discretion in determining that the transfer of custody is in the best interest of M.S.E., the judgment of the trial court *343 awarding permanent custody of M.S.E. to Davin and Heather Evans, with liberal visitation privileges reserved in favor of Mr. Hebert, is affirmed.

AFFIRMED

. In consideration of his privacy, we will refer to the minor by his initials in this opinion.

. Heather, although not an original petitioner, later joined her husband as a petitioner for custody.

. At the time of trial, the Evanses’ younger child had not yet started school.

. Davin Evans testified that he attempted to contact Dr. Klein several times in order to have another interview with him, Heather, and M.S.E. together, but Dr. Klein did not return his calls.