FREDERICKA HOMBERG WICKER, Judge.
| ?Elba Esperanza Ramirez (“Elba”), appeals the trial court’s November 26, 2012 judgment granting her sister, Reyna Ramirez (“Reyna”), the sole custody, care, and control of Elba’s minor child, Carlos Enrique Ramirez (“Carlos”). Elba argues the trial court erred in this judgment because: it did not consider whether the custody award to Reyna would result in substantial harm to the minor child; it did not evaluate all of La. C.C. art. 134’s factors to determine the best interest of the child; and it did not determine whether appellee would provide the minor child a wholesome and stable' environment. For the following reasons we find appellant’s assignments to be without merit and affirm the trial court’s judgment.

FACTS AND PROCEDURAL HISTORY

The instant litigation commenced on April 24, 2012, when Elba filed an “Application for Writ of Habeas Corpus and Emergency Motion for Return of Child” which sought to force her sister, Reyna, to return Elba’s biological son, Carlos. On April 27, 2012, the trial court ordered Reyna to appear with Carlos. On May 16, 2012, a hearing on this matter was continued because Reyna, had not |¿yet been served. Reyna was allegedly served with this application and motion on May 31, 2012.
On June 22, 2012, Reyna failed to appear at a hearing on this matter. The trial court entered an interim judgment ordering the physical custody of Carlos be returned to Elba. Pursuant to this order, Elba and a Jefferson Parish Sheriffs Officer went to Reyna’s home to attempt to *10 remove Carlos. After the officer met and listened to Reyna however, Carlos was not removed from her home.
On July 2, 2012, Reyna filed an expedited motion to vacate the June 22, 2012 judgment and for sole custody of Carlos. Reyna alleged that she had failed to appear in court because she had not been served with the original petition and was not given notice of the June 22, 2012 hearing date. Reyna’s counsel alleged that the May 31, 2012 service was made on the wrong address and that therefore, the trial court’s June 22, 2012 order should be vacated. On July 3, 2012, the trial court denied Reyna’s motion to vacate and set Reyna’s motion for sole custody for July 23, 2012.
After a hearing on July 23, 2012, the trial court vacated its June 22, 2012 order and awarded Reyna temporary custody of Carlos with supervised visitation by Elba; it also issued a temporary restraining order preventing either party from removing the child from Louisiana. The court also ordered that this matter be revisited on September 5, 2012. That hearing date was continued to November 2, 2012.
On November 2, 2012 and November 20, 2012, trial was held on Reyna’s petition for sole custody.[1] At trial, Reyna called three witnesses: herself, her friend, Brhinia Vivas, and her daughter, Yesenei Dubon. They testified as follows:
|4Reyna Ramirez testified that her ten year old nephew, Carlos, has lived with her from the time he was born in Texas on January 27, 2003, and she has been his caregiver and acted as his mother since he was three months old. Reyna became Carlos’ caregiver in May, 2003 after his mother, Elba was arrested for shoplifting at J.C. Penney in Conroe, Texas and deported to Honduras. Although Elba has been back in the United States since 2009, Reyna continues to pay for nearly all of Carlos’ needs including food, clothing and shelter, medical care and school needs.
Reyna testified that she came to the U.S. the first time in 1998, living first in Conroe, Texas. In 1998 when she came to the U.S., her three children, Yesenei, Lis-ette and Danny, remained in Honduras for a year. They lived there with and were cared for by her adult daughter, Yesenei, and Yesenei’s husband. Her three children followed her to Texas in 1999. In 1998, when Reyna left for the U.S., she was also caring for Elba’s son, who she and her family called Luiz,[2] then about eight months old. Reyna continued to live in Conroe, Texas until Hurricane Katrina struck. In 2006, after Hurricane Katrina, Reyna and her family moved to New Orleans because of the job market. She lived at first in New Orleans with Carlos, her friend, Brhinia Vivas, and Lisette, and thereafter moved to Gretna. Recently she purchased a four bedroom home in New Orleans where she lives with her partner, Hilberto; Carlos; her daughter, Lisette; Lisette’s partner, Marvin Mendoza; and their three children.
While Reyna first entered the United States illegally, in 1998 she achieved legal status through Temporary Protective Status, a work permit, through which she has remained in the United States.
In 2003, while Reyna was living in Con-roe, Texas, her sister, Elba, came to the United States from Honduras illegally. *11 Elba was pregnant. Upon her arrival, |sElba lived with Reyna and her family. Elba did not work while she was pregnant or thereafter before her arrest. Reyna supported Elba throughout her pregnancy and after Elba’s child, Carlos, was born. Reyna also took Elba to her pre-natal doctor’s appointments and saw to her care.
On May 21, 2003, after Elba had been with Reyna for a few months, Reyna received a call from the police telling her that Elba had been arrested for shoplifting in a J.C. Penney store. At the time Elba was arrested, she had three-month-old Carlos with her. The security people at J.C. Penney turned the baby over to Reyna. Elba was held for about a month and a half, before being deported back to Honduras. When Elba was being deported, Reyna told her she would take care of Carlos until Elba returned to the U.S.
Between 2003, when Elba was deported, and 2009, when Elba returned to the United States, she provided no financial support for Carlos, was not in contact with Reyna, and sent no cards, gifts, or correspondence to Carlos. While Elba has stated that she could not contact Reyna because she did not have Reyna’s phone number or know where Reyna lived, Reyna indicated that she has only changed her phone number one time in the last ten years and she gave that information to her mother and asked her mother to give it to Elba. Reyna stated she has maintained her same cell phone number throughout the years. Reyna has moved two times in the last five years but knows the person who lives at her former residence in Con-roe, Texas, who has maintained the same phone number Elba knew in 2003. While Elba was living outside the United States, Reyna asked her mother about Elba because she wanted Elba to have a relationship with Carlos.
In 2009'Reyna took Carlos to Honduras to meet his mother, Elba, and his grandmother. They stayed with Reyna’s mother in Honduras for twenty-two days. During their first ten days in Honduras, Elba was with them for three days, leaving | ^thereafter for Mexico while Reyna and Carlos remained in Honduras for the balance of their trip. Reyna covered Carlos’ expenses for the trip.
In November 2009, Elba returned illegally to the United States. After her arrival, Elba lived for about a month and a half in Gretna with Reyna; her partner, Gabriel; Carlos; Reyna’s daughter, Lis-ette; Lisette’s husband, Marvin; and their three children. Reyna allowed Elba to live in her house so that Elba could be close to Carlos. During this time, Elba did not help with Carlos’ needs. She neither helped financially nor with his school-related necessities. According to Reyna, after she helped Elba get a job in the Carrollton neighborhood of New Orleans, Elba left Reyna’s home to live in the Carrollton neighborhood to be closer to work. After Elba moved, she continued to see Carlos frequently for some period of time
According to Reyna, between 2010, when Elba moved out of Reyna’s Gretna home, and 2012, when Elba filed suit, Elba never said she wanted to take her child back to raise him. For a period Elba came by Reyna’s to visit Carlos once or twice a month. Elba worked during that period but did not contribute to Carlos’ support either financially or by buying him necessary items such as clothes, shoes or school supplies. Further, while Elba was in New Orleans for Carlos’ birthday, she did not attend his party. After the last court hearing, however, Elba purchased half of Carlos’ school supplies and her partner bought him shoes.
According to Reyna, she first learned that Elba wanted custody of Carlos in 2012 *12 when Elba showed up at her front door with her grandson, her husband, and a policeman, and demanded that she immediately release Carlos.
Reyna testified that at some point she learned that when Carlos stayed at Elba’s house he shared a bed with Elba and her partner. According to Reyna, when she questioned Elba about this practice, Elba became angry and threatened |7her. After the custody proceedings began, Elba told Reyna, “[y]ou’re going to pay for this.” According to Reyna, six or seven months before the custody trial Elba told her she would prefer to see Carlos dead to living with Reyna.
In discussing Elba’s history, Reyna testified that Elba had six children, Henry, Danny, and Leslie by one man, and Luiz/Andre, an unnamed girl baby, and Carlos by other men. According to Reyna, after Elba’s first three children were born, Reyna’s mother raised them. While Elba was pregnant with Luiz/Andre, her fourth child, Elba was unemployed and lived with Reyna and her family. After Luiz/Andre was born, Elba left Luiz/Andre with Reyna, who cared for him until Reyna left for the United States in 1998. Thereafter, Reyna’s daughter, Yesenei Dubon, cared for Luiz/Andre for a period. At some point, Elba returned and retrieved Luiz/Andre, taking him to his paternal grandmother to care for him. At some later point, Luiz/Andre was removed from this grandmother’s home and raised by Elba’s daughter, Leslie. Reyna testified that after Luiz/Andre was born Elba became pregnant again. She gave birth to a baby girl whom she did not name and gave away to a stranger.
As to her own history, Reyna testified that she was married in Honduras to Hector Manual and also has a partner here, Hilberto Origano. She separated from Hector Manuel in 1992. Reyna first came to the U.S. in 1998. Her daughter, Yese-nei, was born in 1978 and came to the U.S. in 1999. They lived together in Honduras and here in the U.S. Her daughter, Lis-ette, was born in 1980 and Darlene was born in 1983. Reyna entered the U.S. illegally in 1998 and helped her children do the same. A year later, they went to Tapachula, Mexico, where they obtained visas to enter the U.S. through Houston. Reyna has never been arrested and has been with Hilberto for five years. Neither Hilberto nor Marvin has a criminal record. When questioned about Hilberto’s drinking, Reyna testified that |8he drinks at the end of the week. Reyna testified that shé goes out to clubs occasionally, leaving the children at home with Lisette and Hilber-to. Reyna works at El Ranchito, a store and restaurant which Yesenei owns. Reyna works Thursday through Sunday from either 9 a.m. to 3 p.m. or from 3 p.m. to 9 p.m. earning $375.00 to $400.00 per week. She is able to pick Carlos up at school daily because her daughter allows her to leave the restaurant. Because Reyna and Lisette work opposite schedules, someone is home with the children.
With regard to her care of Carlos, Carlos has attended two schools, Terrytown and Boudreaux. Currently, in their four bedroom New Orleans home, Carlos has his own bedroom. He does share a bathroom with six other people. Hilberto is helpful raising Carlos. He buys him clothes, shoes and snacks but does not discipline him. Reyna’s daughters also help Carlos with his school work. Reyna corrects Carlos as any other mother would.
As to building Carlos’ relationship with Elba, according to Reyna, she has always told Carlos he has two mothers, one in Honduras and one in the U.S. She testified that she has unsuccessfully encouraged Elba to have a relationship with Car *13 los and to learn about him. Elba knows neither Carlos’ teachers nor doctor. During this litigation, Elba went to Carlos’ school and tried to change his school, for no discernible reason. As to the time Carlos spent with Elba, when Elba began taking Carlos overnight, he would return angry, “[i]n a bad way.” Reyna allowed Carlos to sleep at Elba’s house unsupervised until this litigation began and Elba threatened her. Because of Elba’s threats, Reyna now takes Carlos to Elba’s house or meets Elba someplace else. Elba’s work schedule limits the time she can spend with Reyna and Carlos somewhat. Since school began, Reyna takes Carlos to see Elba after school on Wednesday, Saturday and Sunday, as ordered by the court. The only disruption in visitation was during Hurricane Isaac, when Carlos 19evacuated to Houston with Reyna, and Elba evacuated to San Antonio. According to Reyna, she would have given Carlos back to Elba, six years ago, but Elba is not a good mother and Carlos has been raised with an entire family.
Reyna called Brhinia Vivas, her friend of fifteen years. Brhinia and Reyna were neighbors in Conroe, Texas and began babysitting each other’s children there. Brhinia also knew Elba when she was pregnant with Carlos and living with Reyna. In May 2003, Brhinia went to J.C. Penney with Reyna to collect Carlos after Elba was arrested. When Elba was arrested she was with Reyna’s daughter, Lisette. Brhinia and Reyna, moved to New Orleans together in 2006 where they continued to live next door to each other. Brhinia continued to babysit Carlos when Reyna worked. Throughout the time Brhinia has known Reyna, she has been a good mother to Carlos and has supported him well.
Reyna also called Yesenei Dubon, her 33-year-old daughter. Yesenei corroborated both her mother’s and Brhinia Vivas’ testimonies. • She also testified that her mother was ' a fine mother to Carlos. Yesenei corroborated the testimony that Elba did not contact them or help support Carlos between 2003 and 2009. Elba worked for Yesenei at El Ranchito for a year or two but left because she was doing things not conducive to the business’ requirements. When Elba left El Ranchito she threatened Yesenei with a knife and told Yesenei she would pay for what- was going on. The day before Yesenei testified Elba again told her that whether Elba won or lost “you are going to pay for it.” Yesenei also corroborated Reyna’s testimony regarding Elba’s personal history with regard, to her other children.
While Yesenei testified that she sees-her mother daily, she testified that she does not know about her- mother’s current personal life. She testified that she does Imnot know whether her mother has a partner with whom she lives. She also testified that she does not know if Lisette was with Reyna when Elba was arrested.
After Reyna rested her case, Elba called three witnesses; herself, her daughter, Danny Ylibeth Maldonado, and her daughter’s husband, Pedro Luiz Gutierrez.
Elba testified that she currently lives in Terrytown with her husband, Alex Matute, who she has been with for three and a half years. She works at a restaurant as a cook, earning $380.00 per week. Her husband, Alex, works as a yard man earning $600.00 per week.
As to the J.C. Penny arrest, Elba testified that she was never convicted. Reyna talked her into not fighting deportation, telling her that the faster she got to Honduras the faster she could come back to the U.S. When she was arrested, Elba was with Lisette. Elba explained that Lis-ette tricked her. She took Elba’s diaper bag and put two bras in it. Lisette also *14 put shorts on under her pants. When the officers checked the diaper bag Elba did not know the bras were there.
After Elba was deported she tried unsuccessfully to re-enter the U.S. three times, starting in 2005, before successfully entering in 2009. She wanted to come back to the U.S. to be with her last son. She did not have the option of taking Carlos back to Honduras with her. She never intended to abandon him. Elba tried to get her mother to give her Reyna’s contact information but she refused. When Elba got a number the call would not go through.
Elba testified that after she returned in 2009 and lived with Reyna, she left Reyna’s house because Reyna became jealous of Elba’s relationship with Carlos. Reyna told Elba there were too many people living in the house and she would have to go. Elba did not take Carlos with her when she left Reyna’s house for Carroll-ton, because Reyna told her she would be risking immigration catching her | n again.[3] Reyna also said she could not have Carlos because she did not drive and so could not get him to school and to the doctor.
After Elba moved out of Reyna’s house, Elba would take Carlos to her house. While Carlos was with Elba at her house, Elba told him that she was his mother. When this happened Reyna told her to stop putting such things in the child’s head. After this when Elba would try to pick Carlos up at Reyna’s house, Reyna would lie and say she was not at home. Reyna also no longer let Elba be alone with Carlos. Since this litigation began, Elba only sees Carlos for short periods of an hour or so. Reyna is not obeying the court’s order. Often Reyna says they cannot get together because she has to work. She will not let Elba take him to church because of work. During the Hurricane Isaac evacuation Reyna would not return Elba’s calls and when they returned to Gretna, Reyna told her they could not get together because she had no water or lights. Elba checked and it was a lie. Elba cannot go to Reyna’s home now because she does not know where Reyna lives. They meet at McDonald’s or wherever Reyna says. Reyna will not allow Elba to pick Carlos up from school. Carlos is confused because Reyna told him she gave birth to him. Carlos told Elba that Reyna told him Elba was trying to kidnap him. Elba wants to be a part of Carlos’ life but Reyna will not permit it. Elba is afraid of Reyna because she has threatened to call immigration.
Elba further testified that she has been buying lots of clothes, shoes and things for Carlos since she has been back but Reyna does not use them because they are not “name brand.” But, Carlos gave her a paper with her name on it to thank her.
As to the occasion on which Elba, her husband, her grandson and the police went to Reyna’s to collect Carlos, Reyna told her granddaughter to tell the police, |12“Tell them that it’s a bad person, and that the child does not know her, and to please leave from here.” So the police would not let her take Carlos.
She also testified that she went to Carlos’ school and tried to change him to another school, but the school would not permit it without Reyna. Elba admitted that she does not know what grade Carlos is in.
Elba has five children. Nathalie Maldonado was the father of her first three *15 children. They are not divorced. She left because he beat her. She had two other children, Andre Ardone and Carlos. Luiz’s name is really Andre but Reyna changed it to Luiz when she was caring for him. Her older children lived with her mother while she worked out of town but she came home to her mother’s regularly, saw her children all the time and supported them financially. Luiz/Andre currently lives in Louisiana near Elba. After Luiz/Andre was born, Elba lived with Reyna for eight months and called the baby Andre. She let Reyna keep the baby for three months while she went to “Morazan” to travel. Reyna did not want to give him back. Reyna changed the baby’s name. It was not, as Reyna said, that Elba did not name him or register him and so Reyna had to do it.
Reyna took Carlos to Honduras in 2009 because Elba asked her to. While there, Reyna would not allow Elba to see him alone because she was jealous. It was Reyna who suggested that Elba go to Mexico to try to get across the border again. Reyna said they would see her in the U.S.
Elba testified that if the court gave her custody of Carlos she would provide him with a stable home. She and her husband live in a two bedroom apartment with a bedroom ready for Carlos. Her daughter would help her with him while she works. She loves all of her children and struggled for them. She had no baby girl whom she gave away. No court ever took any of her children from her. She does 11snot want Carlos for money. He is her last son and she wants him for love. Reyna has never asked her for money for Carlos but she would have provided it.
As to the stability of Reyna’s home, Elba testified that Hilberto is drunk all of the time, that they drink at parties, and Reyna goes out to clubs with her daughters and leaves Carlos with Hilberto. Elba saw Reyna’s son-in-law, Melvin, hit Carlos and he tried to hit her. That was why she left Reyna’s house. Too many people live at Reyna’s and it is not healthy.
After she finished testifying, Elba called Danny Moldonado, her daughter. Danny testified that she went to clubs with Reyna and her daughters while a drunk Hilberto cared for Carlos. She believes Hilberto is a drunk, having seen him drunk many times, and that Reyna drinks and drives all the time.
When Danny told Carlos she was his sister Carlos said, “I got to go because my mom would scold me, and she told me not to talk to you guys.” That occurred about twelve days before Danny’s testimony. Danny thinks Reyna treats Carlos poorly in-part because she would not let him have a water gun Danny bought him because it would get water all over the house.
Elba and Alex get along well and Alex gets along with Carlos. Danny allows her mother to care for her baby. Danny began living with Elba in Honduras when she was thirteen but her mother was always around before that. Her mother worked to provide for them.
Pedro Luiz Gutierrez testified that he is Danny’s husband. He has seen Elba and Carlos together four times and they did well. He was present with Elba when the police accompanied them to Reyna’s to collect Carlos. While they were there Reyna told Carlos that Elba was not his mother and Elba cried. Pedro further testified that Carlos has told him that he loves Elba and that every time Pedro has spoken to Hilberto, Hilberto has been drunk.
|14At the conclusion of the trial, the court took the matter under advisement. The trial court rendered judgment on November 26, 2012, which, in relevant part, or *16 dered that “Reyna Ramirez is granted the sole custody, care, and control of said minor, Carlos Enrique Ramirez pursuant to La. C.C. art. 138 [and that] Elba Esperanza Ramirez is granted liberal visitation with said minor, Carlos Enrique Ramirez.” The trial court did not issue separate reasons for judgment in connection with this judgment. Elba now appeals this judgment.

DISCUSSION

In this appeal, Elba argues that the trial court erred in its November 26, 2012 judgment, both in its application of the law and in the conclusion it reached. In each assignment of error, Elba argues the trial court erred when it granted sole custody of Carlos to Reyna, with only “liberal visitation” to Elba. In her assignments, Elba argues the trial court erred: first, because it did not consider whether the award of custody to Elba would result in substantial harm to the minor child; second, because it did not evaluate all of the factors set in La. C.C. art. 134 for determining the best interest of the child; and third, because it failed to determine whether Reyna would provide a wholesome and stable environment for Carlos.
In this case, Reyna, a non-parent, petitioned for sole legal custody of Carlos, a minor child, and made. Elba, the child’s biological parent, a defendant. The determination of Reyna’s petition is governed by Louisiana Civil Code article 133, which provides that:
If an award of. joint custody or of sole custody to either parent would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment.
La. C.C. art. 133.
| iaThis article provides for a dual test for divesting a biological parent of the custody of his or her child. As explained by the Third Circuit:
[B]efore a trial court deprives a parent of the custody of his or her child, the trial court must first determine that an award of custody would cause substantial harm to the child. If so, then the courts look at the best interest of the child factors in Article 134 to determine if an award of custody to a non-parent is required to serve the best interest of the child. Wilson v. Paul, 08-382 (La.App. 3 Cir. 10/1/08), 997 So.2d 572 (citing Tennessee v. Campbell, 28,823 (La.App. 2 Cir. 10/30/96), 682 So.2d 1274).
Black v. Simms, 08-1465 (La.App. 3 Cir. 6/10/09), 12 So.3d 1140, 1143. See also, Remondet v. Remondet, 08-838, p. 4 (La.App. 5 Cir. 4/28/09), 13 So.3d 1127, 1129 (“In addition to the factors set out in La. C.C. art. 134, a non-parent must show that substantial harm will result to the child if the custody is not changed to a non-parent”). The burden of proof on the non-parent requires a showing that the granting of custody to the parent would result in substantial harm by clear and convincing evidence. Carpenter v. McDonald, 2013 WL 557020, 12-1460, p. 1 (La.App. 1 Cir. 2/13/13); Rupert v. Swinford, 95-0395 (La.App. 1 Cir. 10/6/95), 671 So.2d 502, 505.[4]
*17 La. C.C. art. 13B Comment (b) states that while “substantial harm” is a change in terminology from the previous law, it is not entirely new to Louisiana jurisprudence. In pertinent part, that comment provides:
Prior to the 1982 introduction of the two-part statutory test that parental custody be shown to be “detrimental” to the child and that divestiture be “required to serve the best interest of the child,” the courts had followed the jurisprudential formula: “the parent ... may be deprived of ... custody only when (he) has forfeited his or her right to parenthood, ... is unfit, or ... is unable to provide a home for the child.”
11fiLa. C.C. Ann. art. 133, cmt. (B) (citing Deville v. LaGrange, 388 So.2d 696, 697-98 (La.1980)).
“The concept of substantial harm under art. 133 includes parental unfitness, neglect, abuse, abandonment of rights, and is broad enough to include ‘any other circumstances, such as prolonged separation of the child from its natural parents, that would cause the child to suffer substantial harm.’ ” Mills v. Wilkerson, 34,694, p. 6 (La.App. 2 Cir. 3/26/01), 785 So.2d 69, 74 (quoting Hughes v. McKenzie, 539 So.2d 965 (La.App. 2 Cir.), writ denied, 542 So.2d 1388 (1989)).
After the non-parent meets his or her burden of proving substantial harm, the court must consider the best interest of the child. On the determination of the child’s best interest, La. C.C. art. 134 states:
The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
|17(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
“The primary consideration and prevailing inquiry is whether the custody arrangement is in the best interest of the child.” McCormic v. Rider, 09-2584, pp. 3—4 (La.2/12/10), 27 So.3d 277, 279 (citing Ay- *18 ans v. Lungrin, 97-0541, 97-0577 (La.2/6/98), 708 So.2d 731).
Here, we have no indication that the trial court, in making its determination, failed to- follow the- law as set forth in La. C.C. arts. 133 and 134. While neither party requested separate reasons for judgment from the trial court, the transcript reveals that the trial court did consider the substantial harm Elba’s status as an undocumented immigrant could cause Carlos:
You know, and the fact that if something happens and Elba has to be deported back to Honduras, she has custody of a child. The child goes back to Honduras. He has never lived in Honduras other than visit Honduras, and so now he’s taken from here. I know the same thing could happen with Reyna, too, though. If the T.P.S. [Temporary Protective Status] somehow for some reason — ... it’s not extended, then she has to go back, too. But the chances are better with Reyna it appears than with Elba.
Thereafter, the trial court acknowledged that under the applicable La. C.C. art. 133, the burden of proof was on Reyna.
While there is a dearth of jurisprudence in Louisiana on how a parent’s possible deportation affects a finding of substantial harm, other states have faced this issue. In deciding In re E.N.C., 384 S.W.3d 796, 805 (Tex.2012), the Supreme Court of Texas ruled that the mere threat of deportation was insufficient 11sto establish a child’s endangerment.[5] The Supreme Court of Nebraska, in deciding In re Angelica L., 277 Neb. 984, 1009, 767 N.W.2d.74, 94 (2009), also found that mere deportation of a parent was not sufficient for the state to terminate her parental rights. In that case, the Supreme Court of Nebraska ruled for the parent, who was currently residing in Guatemala, despite the fact that her children had lived in the United States for their entire lives. Id. at 1009, 767 N.W.2d 74.
We agree that the fact that Elba is subject to deportation is not alone sufficient to support a finding that an award of custody to Elba would result in substantial harm to Carlos. Here, however, there is more than that possibility. Here, Elba’s possible deportation, combined with the uncertainty created by Elba’s history of delegating the responsibility for raising her other children to others, as well as her failure to support and keep in contact with Carlos, are sufficient for the trial court to have reasonably found that Carlos would have faced substantial harm if Elba was granted custody in this case.
Additionally, the transcript from the hearing on the petition indicates that the trial judge correctly applied La. C.C. art. 133 in making its decision. The transcript of the hearing clearly shows that the trial court correctly considered Carlos’ best interest to be paramount, stating:
Let me just tell Ms. Elba Ramirez and Ms. Reyna Ramirez, it’s not about the two of you. It’s about Carlos, and whatever decision I make will be in the best interest of the child.. And if both of you really love Carlos and you want to do what’s best for him, then you will put everything that happened behind you and try to move on and allow this child to enjoy all of his family, not just part of his family.
Here, the record reflects that the trial court heard testimony on: Carlos’ emotional ties to the parties; the capacity of the parties to love and provide for Carlos; the condition of the parties’ residences; *19 the moral fitness of the parties and 119the people that they lived with; Carlos’ school history; each party’s willingness and ability to facilitate and encourage a close and continuing relationship between the child and the other party; the parties’ ability to drive and the distance between them; and each party’s history with regard to caring for and supporting Carlos. On the record before us, we cannot find that the trial court erred in applying the law.
This Court, in In re M.S.E., 12-553, p. 20 (La.App. 5 Cir. 3/13/13), 113 So.3d 327 addressed an assignment of error, similar to Elba’s assignments, which argued that the trial court erred by making no mention of several of the La. C.C. art. 134 factors for determining a child’s best interest. In that case, we found the trial court did not manifestly err, despite these omissions from its reasons for judgment. In so ruling, we recognized that:
The trial court is not bound to make a mechanical evaluation of all of the statutory factors listed in Article 134; rather, the court should decide each case on its own facts in light of those factors. The factors listed in Article 134 are not exclusive, but are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court. Every child custody case must be decided in view of its own particular set of facts and circumstances with the paramount goal of reaching a decision that is in the best interest of the child. On appellate review, the determination of the trial court in establishing custody is entitled to great weight and will not be disturbed on appeal absent a clear showing of an abuse of discretion.
Id. at p. 22, 113 So.3d at 339 (internal citations omitted). See also, Robertson v. Robertson, 10-926 (La.App. 5 Cir. 4/26/11), 64 So.3d 354, 363.
In line with our decision in In re M.S.E., we find that the trial court did not err in its failure to explicitly make findings on all of La. C.C. art. 134’s factors for determining the best interest of the child. We find that the trial court’s judgment here was legally sufficient when it stated that its judgment was made, “pursuant to La. C.C. art. 133.” Accordingly, to the extent that Elba argues the trial court erred in failing to make certain findings explicitly, we find Elba’s assignments to be without merit.
| ^Furthermore, we cannot say that the trial court manifestly erred in its grant of custody to Reyna and liberal visitation to Elba. Here, the evidence established that Carlos has a close connection with Reyna and calls her his “mama.” The evidence also establishes that Reyna has been Carlos’ primary caretaker for almost his entire life, providing him almost all of his food, shelter, clothing, medical treatment, education, and family activities. The evidence showed that Elba currently resides in the United States illegally as an undocumented immigrant and has been deported from the United States three previous times. In contrast, Reyna has Temporary Protective Status in the United States and is legally therefore allowed to live and work in this Country. Under these circumstances, we cannot say that the trial court manifestly erred when it awarded Reyna legal custody of Carlos but also gave “liberal visitation” to Elba.
Accordingly, we find Elba’s assignments to be without merit, and therefore affirm the trial court’s judgment.

AFFIRMED

. Reyna, through her attorney Ms. Ramona Fernandez, had filed a Petition for Termination of Parental Rights on August 23, 2012, which was withdrawn and dismissed at the beginning of this hearing.

. Elba later testified that she named this child "Andre” but that Reyna called him "Luiz.” Because the record is not clear on this child's name, we refer to him has "Luiz/Andre.”

. At trial, Elba's counsel conceded that she is currently residing in the United States illegally and therefore may be deported.

. See also, Santosky v. Kramer, 455 U.S. 745, 753-54, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (recognizing the fundamental liberty interest a parent has in his or her child and concluding that the state must provide a parent with fundamentally fair procedures, in-eluding a clear and convincing evidentiary standard, when seeking to terminate parental rights); and Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (observing that "the Due Process Clause applies to all 'persons' within the United States, *17 including aliens, whether their presence here is lawful, unlawful, temporary, or permanent”).

. In contrast to the case at bar, there was no evidence the parent at issue in In re E.N.C. abandoned his parental responsibilities once he was deported. In re E.N.C., supra at 805.