# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 22-668

**STATE OF LOUISIANA**

**VERSUS**

**SEDRICK R. TENNESSEE**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. 19-1798
HONORABLE JOHN C. REEVES, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**ELIZABETH A. PICKETT
CHIEF JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Sharon Darville Wilson, and Gary J. Ortego, Judges.

**AFFIRMED.**

Edward K. Bauman
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT-APPELLANT:**
     Sedrick R. Tennessee

**Bradley R. Burget**
**District Attorney, Seventh Judicial District**
**Joseph A. Boothe**
**Assistant District Attorney**
**4001 Carter St., Suite 9**
**Vidalia, LA 71373**
**(318) 336-5526**
**COUNSEL FOR APPELLEE:**
     State of Louisiana

**PICKETT, Chief Judge.**

## FACTS

Haley Williams, victim Fred McCray, Jr.'s sister, testified that she accompanied her brother to a Mardi Gras krewe party on the night of June 22, 2019. The two rode in his 2012 black Audi. Mr. McCray's vehicle had a personalized front license plate bearing his nickname, "Big Daddy."[1] After leaving the party, Mr. McCray took his sister home around 1:00 a.m. and then went to hang out with friends or find another party, possibly in Natchez. When Mr. McCray was discovered missing the next day, Ms. Williams tracked his phone to a location not far from where the party had been held. She notified law enforcement of its location.

The victim's cell phone was retrieved by Concordia Parish Sheriff's Deputy Justin Stevens on June 23, 2019, in the grass just off the roadway near the corner of Highway 3232 and Highway 15 outside Ferriday, Louisiana. His inspection of the phone revealed that the victim's bank had sent text messages indicating the possibility of fraudulent charges on his bank card at Walmart in Natchez, Mississippi. Video footage retrieved from Walmart cameras aided in revealing the identity of the person who used the victim's card, Ronald Riley. Mr. Riley provided authorities with the clothing left at his home by the defendant, Sedrick Tennessee, after the defendant showered and changed there the night of the incident. Additionally, Mr. Riley provided information he overheard from the defendant regarding the location of the victim's body which ultimately led authorities to the discovery of the victim's body near an embankment across from a Ferriday, Louisiana mill yard. On the victim's body were a bracelet and a ring.

---

[1] Information regarding the personalized plate was elicited during the testimony of the victim's mother, Carol Williams.

Sam King, an officer of the Ferriday Police Department at the time of the incident, reviewed video camera footage showing Mr. Riley leaving Walmart after he made purchases with the victim's credit cards, and then at the Holiday Apartments where Mr. Riley and his girlfriend lived. On the video, he saw the victim's vehicle enter the complex (personalized plate intact), the defendant exit the vehicle, Mr. Riley enter the vehicle, and the vehicle leave the complex. Mr. Riley told Officer King he and the defendant went to the carwash and wiped down the vehicle. A camera near the carwash showed the victim's Audi entering the carwash at 8:04 a.m. and being washed by Mr. Riley. At that time, the vehicle no longer had the personalized license plate. After washing the car, Mr. Riley left the carwash, walking north toward Walmart. The camera showed that the vehicle left the carwash and headed south on Highway 61 which leads to Woodville, Baton Rouge, and New Orleans.

Mr. Riley, who previously pled guilty to accessory after the fact to first degree murder for his involvement in this case, testified that the defendant knocked on his door around 7:00 a.m. on June 23, 2019. He knew the defendant through mutual acquaintances, but the defendant was looking for someone who previously had occupied Mr. Riley's apartment. The defendant asked for a change of clothing because his shirt was damp, and Mr. Riley provided some. The defendant offered Mr. Riley some marijuana and asked if Mr. Riley had a cigar. He did not, so the two walked to the store and Mr. Riley bought a cigar which they later filled with marijuana and smoked. Mr. Riley testified that while he was riding in the victim's Audi with the defendant, before they went to the carwash, the defendant pulled into someone's driveway, removed the "tag" from the front of the victim's vehicle, and threw it in the bushes. While in the car, Mr. Riley observed a red substance in and running down the side of the console of the car. He said that the substance running

down the side looked "old," but he described the substance inside the console as wet. The defendant and Mr. Riley went to the carwash where the defendant asked Mr. Riley to wash the car because he was getting it ready to sell. Before Mr. Riley exited the car, he took a black pouch from the passenger door which contained the victim's credit cards. On June 23, 2019, he used these cards at Walmart in Natchez, Mississippi. When he learned that police were looking for him for using the cards, he contacted authorities and ultimately met with Officer King and then Lieutenant Chris Groh. He told Lt. Groh that he overheard the defendant on the phone saying "something with an 'M,' 'ville.'" Mr. Riley told Lt. Groh that the defendant said, "Man, I got this truck as a whole lick. I'm fixing to try to sell it." Mr. Riley confirmed that a "lick" can mean robbery.

Information received by other deputies indicated that Jimmy Lewis was possibly involved in the shooting of the victim. Officers went to the location where they were told Mr. Lewis may be, and after Mr. Lewis was spotted, he fled, hiding in an area of abandoned buildings. However, he later exited one of the buildings and surrendered himself to law enforcement.

Lt. Groh, who was with the Concordia Parish Sheriff's Department when the offense occurred, testified that he interviewed Mr. Lewis on June 24, 2019, after advising him of his rights. During his interview with Lt. Groh, Mr. Lewis confessed to murdering Mr. McCray, something he was still very upset about. During a subsequent search of Mr. Lewis' home, police recovered tennis shoes that Mr. Lewis admitted to wearing during the commission of the crime. Mr. Lewis was subsequently interviewed again on July 22, 2019, and he provided a recorded statement. Lt. Groh also spoke to Mr. Lewis on December 8, 2020, shortly before trial, in his office at the jail where he was then the warden. The statement was not recorded. Lt. Groh asked Mr. Lewis if this was a planned robbery, and he replied

that it was not, but he said that the defendant "continuously throughout that nine days before, [Defendant] kept saying, 'Man, I gotta get some money. I've gotta get some money.'" Mr. Lewis confirmed to Lt. Groh that this was a "spur of the moment situation," and he also confirmed that the defendant did not have a gun. Lt. Groh never found any evidence of a coordination between Mr. Lewis and the defendant to rob Mr. McCray.

According to Lt. Groh, Mr. Lewis told him that when they got to "Lower Levee Road," he got out to urinate, and when he returned to the vehicle, there was a "slap fight" between the victim and the defendant. It appeared to him that the defendant was attempting to pull the victim's rings off his hands, and the victim was trying to stop him. Mr. Lewis said he brandished his gun and told them to "chill out." He then pointed the gun at the victim and, because he did not "chill out," Mr. Lewis shot him in the head.

Lt. Groh subsequently received information that the defendant had been picked up in Jefferson Parish, so he and Agent Phillip Smith traveled there and interviewed the defendant after advising him of his rights. In the defendant's recorded statement, taken June 25, 2019, he stated that he was standing on Second Street and Mr. Lewis was standing on Third Street when the victim pulled up in his Audi and said he was going to Clayton. The defendant asked him for a ride and the victim agreed to take both he and Mr. Lewis to Clayton. Along the way, Mr. Lewis told the victim to stop because he needed to urinate. According to the defendant, Mr. Lewis held a gun on the victim from the back seat and told the victim to give [him] everything he had. The victim did not obey and attempted to drive off. Mr. Lewis shot him in the head and then dumped his body. The defendant said he saw Mr. Lewis go through the victim's pockets. When the defendant was asked if he ever tried to stop Mr. Lewis, he said that he did not

4

because Mr. Lewis had a gun. He told Mr. Lewis, "you trippin." The defendant confirmed that he left town in the victim's car because he was "fucked up in the head" over what had happened, and he ran, instead of going to law enforcement, because he was scared of Mr. Lewis.

During Lt. Groh's subsequent testimony, he confirmed that the defendant told him that after he had the car washed, he tried to stop and put gas in his vehicle. He begged for money, and he also went to a hospital and begged for food, because he had no money. During the commission of the robbery, the defendant indicated that "we" [he and Mr. Lewis] demanded money from the victim, and Lt. Groh said that in his opinion, this indicated coordination between the two men.

The Gretna Police Department provided Lt. Groh with items found in the defendant's possession, including the 2012 black Audi SUV and a cell phone. Lt. Groh confirmed that there was no evidence that Mr. Lewis took anything of value from the victim's vehicle or his person, but the defendant took the vehicle, cell phone, and credit cards in the vehicle (before Mr. Riley took them).

Mr. Lewis testified at trial. The month prior to trial, he had been convicted of the first-degree murder of Mr. McCray and sentenced to life. He confirmed that he shot the victim from the back seat and then dragged his body out of the driver's side of the vehicle. He removed nothing from the victim's body. Before he and the defendant encountered the victim, Mr. Lewis said he was armed with a gun for protection because of where he was "hanging at." In his first statement, Mr. Lewis said he gave the gun to the defendant who then left with it. However, at trial, Mr. Lewis confirmed that this was not true, and he had said that to try to protect himself. Mr. Lewis was asked why he shot Mr. McCray. He said it was to help the defendant, his friend, who was getting overpowered by Mr. McCray during the struggle. He then explained that he did not mean to shoot the victim. He was

5

trying to scare him, and Mr. Lewis said he was under the influence of drugs. Shortly thereafter, he testified that he did in fact intentionally shoot Mr. McCray, however, there was no "plan" to rob Mr. McCray or shoot him. He explained that when he re-entered the vehicle after urinating, he tried to help the defendant rob Mr. McCray.

On cross-examination, Mr. Lewis agreed that he did not mention trying to help the defendant in either the statement he gave on June 24, 2019, or July 22, 2019. When shown a picture of the victim's deceased body, Mr. Lewis acknowledged that there was a bracelet and a ring on the victim's body. When shown a picture of the victim before the shooting, Mr. Lewis agreed that there was a chain around the victim's neck, however, he testified that when he disposed of the body, the chain was not there, and Mr. Lewis said he had not removed it. Mr. Lewis explained that it was the defendant's idea to get in the victim's vehicle, and that he personally had no plans to go to Clayton that night.

The defendant was originally indicted by grand jury indictment with the first degree murder of Fredrick McCray, Jr., in violation of La.R.S. 14:30. The charge was subsequently amended to second degree murder, and a jury, by a unanimous vote, convicted him of the charged offense. The defendant was sentenced to a mandatory life sentence without the benefit of parole, probation, or suspension of sentence. He is before this court appealing his conviction.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record in this appeal, we find there are no errors patent.

6

## ASSIGNMENTS OF ERROR

1. The evidence admitted at trial, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979) standard, was insufficient to prove beyond a reasonable doubt that Sedrick Tennessee committed, or was a principal to, robbery or attempted robbery, and, by application of the felony-murder doctrine, a principal to second degree murder.

2. The Court abused its discretion when it denied Mr. Tennessee's Motion for New Trial, thereby allowing statements made by Jimmy Lewis in 2020, and provided to Defense counsel the morning of trial, to be admitted.

3. The Court erred in allowing prejudicial gruesome photographs of Mr. McCray's body, post mortem, to be admitted at trial, as the probative value was outweighed by their prejudicial effect.

4. The Court erred in allowing the State to support the credibility of its witness, Jimmy Lewis, before it had been attacked.

## ASSIGNMENT OF ERROR NUMBER ONE

The defendant contends the evidence presented by the state was insufficient to prove he was a principal to a robbery and thus to the second-degree murder of Mr. McCray via the felony-murder doctrine. He notes that the first two statements given by co-defendant Jimmy Lewis indicated there was no plan to rob Mr. McCray, and then approximately a week before trial, Mr. Lewis stated the defendant had been saying for days that he needed to get some money. According to the defendant, Mr. Lewis *assumed* when he returned from urinating that the defendant and Mr. McCray were "tussling" because the defendant was in the process of robbing Mr. McCray. He contends that a "slap fight" between two intoxicated friends does not indicate a robbery was in progress. The defendant contends that if he planned to rob Mr. McCray, he would have waited until Mr. Lewis returned from urinating as the victim was twenty-seven years old, 5'7" and 220 pounds while the defendant is forty-one years old, 170 pounds, and has a

7

prosthetic leg. At best, he contends his panicked flight from the scene, failure to render aid, or call authorities supports a conviction of accessory after the fact.

The standard of review for a challenge to the sufficiency of the evidence presented is as follows:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson,* 425 So.2d 1228 (La.1983). To obtain a conviction, the elements of the crime must be proven beyond a reasonable doubt.

*State v. Thacker*, 13-516, p. 5 (La.App. 3 Cir. 1/28/15), 157 So.3d 798, 804 (quoting *State v. Freeman*, 01-997, pp. 2-3 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580).

As for appellate review, in cases relying on circumstantial evidence, this court has stated the following:

> When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d

8

1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10-11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826-27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, ―― U.S. ――, 138 S.Ct. 392, 199 L.Ed.2d 290 (2017).

*State v. Worley*, 21-688, pp. 3-4 (La.App. 3 Cir. 8/3/22), 344 So.3d 757, 760-61, *writ denied*, 22-1381 (La. 12/20/22), 352 So.3d 86.

The defendant was convicted of second-degree murder, which is defined in La.R.S. 14:30.1 in pertinent part as follows:

A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

(2) When the offender is engaged in the perpetration or attempted perpetration of . . . armed robbery, first degree robbery, second degree robbery, simple robbery, . . . even though he has no intent to kill or to inflict great bodily harm.

Louisiana Revised Statutes 14:24 defines the law of principals as follows:

All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

In *State v. Bryant*, 21-240, p. 10 (La.App. 3 Cir. 12/22/21), 333 So.3d 495, 501, this court stated:

The Louisiana Supreme Court in *State v. Neal*, 00-674, p. 12 (La. 6/29/01), 796 So.2d 649, 659, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002) (citation omitted), explained that "the defendant's mere presence at the scene is not enough to 'concern' him in the crime. Only those persons who knowingly participate in the planning or execution of a crime may be said to be 'concerned' in its commission, thus making them liable as principals."

Thus, for this court to affirm Defendant's conviction, we must determine whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that Defendant knowingly participated in the armed robbery of Gilbert Greene.

This court concluded that sufficient evidence was presented to prove the defendant was guilty as a principal to armed robbery with a firearm under the following circumstances:

> As addressed previously, Mildred identified Defendant at trial. Mildred testified that she knocked on Greene's door; that she let Defendant inside Greene's home; that she heard Defendant and Greene argue, followed by two gunshots; that she told Greene to give his money to Defendant if he wanted to live; and that the stolen money was divided up later that evening. Similarly, Sydney testified that he and Defendant planned the robbery in advance; that once he entered Greene's home, he (Sydney) saw Greene on the ground bleeding; and that Defendant then handed him a gun. Greene's testimony was essentially the same, though Greene provided more detail about the things of value that were taken from him.

> As stated by the Louisiana Supreme Court in *State v. Higgins*, 03-1980, p. 6 (La. 4/1/05), 898 So.2d 1219, 1226, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005): "[I]n the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion."

> Here, multiple witnesses testified against Defendant. And although Mildred was also charged in this incident and benefited from a plea bargain made in exchange for her testimony, the jury was made aware of that fact, and Defense counsel questioned her about her credibility. This is also true of Sydney's testimony, even though he was not testifying pursuant to a plea agreement. But here too, the jury was made aware of these facts, and Defense counsel examined Sydney about his credibility. In the end, the jury believed the witness testimony about Defendant's involvement in the armed robbery.

> As summarized by the Louisiana Supreme Court in *State v. Neal*, 796 So.2d at 658-59 (citations omitted):

>> [T]he jurisprudence in Louisiana generally holds that an accomplice is qualified to testify against a co-perpetrator even if the prosecution offers him inducements to testify; such inducements would merely affect the witness's credibility. As the United States Fifth Circuit has found, "a conviction may be based even on uncorroborated testimony of an accomplice or of someone making a plea bargain with the government, provided that the testimony is not incredible or otherwise insubstantial on its face." *United States v. Osum*, 943 F.2d 1394, 1405 (5th Cir.1991).

Based on the foregoing, we conclude that a rational trier of fact could have found proof beyond a reasonable doubt that Defendant was guilty of the crime of being a principal to armed robbery. It was the jury's prerogative to assess the credibility of the witnesses and to accept or reject their testimony. We will not second guess the jury's credibility determinations, nor will we impinge on its role as factfinder. Accordingly, Defendant's conviction for being a principal to armed robbery is affirmed.

*Bryant*, 333 So.3d at 501-02.

After reviewing the testimony and evidence, we find the state proved the defendant's guilt as a principal to second degree murder beyond a reasonable doubt. When viewing the evidence in a light most favorable to the prosecution, we conclude a rational trier of fact could find that all reasonable hypotheses of innocence were excluded. The evidence viewed in this light showed that it was the defendant's idea to get in the victim's vehicle. When Mr. Lewis re-entered the victim's vehicle, after having exited the vehicle to urinate, he stepped in to help the defendant, who was in the process of trying to rob Mr. McCray but was being overpowered. After Mr. Lewis shot the victim and disposed of his body, the defendant took the vehicle, removed the victims' personalized plate, had Mr. Riley clean the vehicle, and he headed toward the Baton Rouge/New Orleans area with the expressed intent to sell it. The defendant was overheard saying, "Man, I got this truck as a whole lick. I'm fixing to try to sell it." We find the evidence presented by the state was sufficient to establish the defendant's guilt beyond a reasonable doubt. Accordingly, we find this assignment of error has no merit.

## ASSIGNMENT OF ERROR NUMBER TWO

The defendant contends the trial court erred in denying his motions for mistrial and for new trial, based on the admission of Mr. Lewis' unrecorded

11

statements first to Lt. Groh,[2] and then to Lt. Groh, the prosecutor, and Mr. Webber (District Attorney investigator) the week before trial indicating the defendant participated in the robbery of the victim. Defense counsel acknowledges that no exculpatory evidence was elicited during these statements, but he contends that this late disclosure required him to rethink his trial strategy during trial. Further, he contends it was not harmless error because the evidence presented at trial failed to exclude the reasonable theory that the defendant was not attempting to rob the victim, and it was only in the mind of Mr. Lewis that a robbery was taking place and he was somehow helping his friend by shooting the victim.

The state's position on appeal is that the oral statement given by Mr. Lewis the week before trial did not contradict his June 24, 2019 statement wherein Mr. Lewis said he and the defendant told the victim to give them his money, nor his July 22, 2019 statement in which he said the defendant was trying to take something from the victim.

Shortly after defense counsel's cross-examination of Lt. Groh began, counsel asked Lt. Groh whether Mr. Lewis said that he and the defendant had not planned the robbery. Lt. Groh responded, "He said that they had not made a plan to do this. What he said to me was that continuously throughout the nine days before, Mr. Sedrick Tennessee kept saying, 'Man, I gotta get some money. I've gotta get some money.'" When defense counsel said that he had not seen this in Mr. Lewis' recorded statements, Lt. Groh said that Mr. Lewis told him this in his office [at the jail] about a week prior to trial. Defense counsel asked how he could verify or corroborate this, and Lt. Groh told him that he would have to question Mr. Lewis as a witness.

---

[2] At the time of these pretrial discussion, Lt. Groh had been reassigned to serve as Warden of the facility where the defendant was housed. For clarity, we refer to Chris Groh as Lt. Groh throughout the opinion, though references to Warden Groh in quoted material refer to the same person.

12

Defense counsel objected on the basis that this statement had not been provided to him in discovery. The state responded:

> Your Honor, it's not in discovery. I don't have possession of anything like that. I think he's asking the - - the witness questions [ ] about whether he had the conversations with Mr. Lewis. I'm not sure. It must be some confusion between the attorney and the witness in regards to what conversations he had with Jimmy Lewis. But I - - I didn't ask him any questions about any other conversations except for the recorded statement and that's the information that was turned over to Counsel. I'm not aware of any conversations that Mr. Groh had with Mr. Lewis.

When defense counsel informed the court that the late disclosure was a problem, the state again explained that it was not in possession of "any conversations recorded or written statements between Jimmy Lewis and this witness except for what I have given you." Defense counsel also argued this was a *Brady* violation, and the prosecutor noted that the statement was not exculpatory. The judge stated this amounted to harmless error based on everything the prosecutor stated, noting again that everything in the state's possession had been turned over to defense counsel. The parties were allowed further argument after the jury was released for the evening, during which time defense counsel made a motion for mistrial for the alleged discovery violation. The prosecutor acknowledged that he had a duty to turn over exculpatory evidence but noted this was not exculpatory. Further, he stated that he was going to call Mr. Lewis as his next witness and defense counsel could cross-examine him regarding the conversation with Lt. Groh. The trial court ultimately denied the motion for mistrial.

When court resumed the following day, the prosecutor stated, "Warden Groh wrote me a statement," which he had provided to defense counsel that morning. The written statement was then read aloud:

"I, Warden Chris Groh, spoke with D.A. Brad Burget who around Tuesday, December 8, 2020, asked to see if inmate Jimmy Lewis would agree to meet with him and possibly to testify against Sedrick Tennessee in his upcoming trial on Wednesday, December the 9th. I asked - -" I being Chris Groh, "Jimmy if [he] would agree to talk to D.A. Burget and possibly to testify against - - testify in Sedrick Tennessee's trial, and Jimmy agreed and stated that he would. I asked - - "I being Mr. Groh - - "asked Jimmy myself if the crime was a planned robbery and Jimmy said it was not, but that Sedrick Tennessee had been saying earlier that night, that several days before that, that he needed to get some money. I," being Groh, "asked him again if they had as a pair verbally decided to rob Fred McCray, Jr., and Jimmy stated that they did not. On Friday, December the 11th, 2020, Jimmy Lewis met with Brad Burget and I at my office." End of report signed Warden Chris Groh dated 12/16 of '20.

The prosecutor subsequently stated:

But in - - going - - following up that - - that situation, I was going to ask Mr. Lewis about this when he's on the stand, but to let [sic] Mr. Johnson fully aware, I did go speak to Jimmy Lewis on the last Friday which would have been the 11th day of December, 2020 and I did so with the permission of his attorney, Mr. Darrel Hickman, prior to talking to Mr. Lewis. Mr. Lewis told me essentially the same thing that he said in his second statement to Lieutenant Groh, which was done on the July 22nd date, 2019. It's been provided in discovery.

Defense counsel continued with his questioning of Lt. Groh, first referencing the typed statement that he provided that morning. During this questioning, Lt. Groh explained that he spoke with the prosecutor on December 7, 2020, and the prosecutor asked Lt. Groh to ask Mr. Lewis if Mr. Lewis would talk to the prosecutor, and whether Mr. Lewis would be willing to testify in the defendant's trial. Mr. Lewis said that he would. Lieutenant Groh, then warden, had Mr. Lewis brought to his office where he, the prosecutor, and Phillip Webber (the D.A.'s investigator) were present. They talked to him for about twenty to thirty minutes during which time no promises were made. During questioning at trial by the prosecutor, Lt. Groh confirmed that what was said during this meeting was verbatim what was said in his recorded statement given on July 22, 2019.

Lieutenant Groh subsequently clarified that when Mr. Lewis told him about the defendant needing money, that conversation occurred several days prior to the meeting with the prosecutor and investigator and was solely between he and Mr. Lewis. The conversation occurred when he summoned Mr. Lewis to his office to ask if he would be willing to meet with the prosecutor and to testify at the defendant's trial.

Although counsel first learned of this statement during his cross-examination of Lt. Groh, he did not request a continuance of the trial to rethink his trial strategy. Further, defense counsel extensively cross-examined Lt. Groh and Mr. Lewis regarding the statement. There was no violation of the discovery statutes. The statements were not exculpatory. This assignment of error has no merit.

### ASSIGNMENT OF ERROR NUMBER THREE

The defendant contends the trial court erred in admitting postmortem photographs of the victim's body as the prejudicial effect outweighed their probative value. Because Mr. Lewis admitted he shot the victim, dragged his body down an embankment, and covered it with debris, the defendant argues that there was no need to show the jury pictures of the victim's body covered with trash and his underwear pulled down. Additionally, he contends there was no reason to admit photographs of his wound with larvae crawling around.

The state asserts that its requirement to prove the elements of the crime, specifically that a human being was killed while the offender was engaged in the perpetration/attempted perpetration of a robbery, is not limited to the confession/statement/testimony of Mr. Lewis. The state maintains that it withheld the most graphic of the photographs and did not introduce them at trial so as not to prejudice the jury.

Prior to the admission of the photographs by the state, the court called the parties to the bench and had them review each photograph. The photographs objected to by the defense that are the subject of this assignment of error are State's Exhibit #26 (photograph of the victim's partially unclothed (upper) body with a rope tied around his ankles and his underwear and pants partially pulled down) and State's Exhibits #32-37 (photographs of the victim's head and chest area showing the exit wound with "insect activity" on the body.

As for State's Exhibit #26, the State argued:

Your Honor, it shows his condition of his body. He was dumped and drug down in that - - in that - - that ravine and this is just evidence of that. And, obviously, I've already told the Jury that Mr. Tennessee did not do that. Mr. Lewis did. So, it's really not that prejudicial in regards to Mr. Tennessee.

As for State's Exhibit #32, the defense pointed out that there were larvae on the body around the chin area, neck, and upper chest. The prosecutor replied:

That's correct, Your Honor. It also it shows the shirt, the red shirt and we - - it identified the body. It also shows the exit wound to Mr. - - Mr. McCray's chin. And it does show insect activity on his body.

The same objection, without further explanation, was raised to the remaining similar photographs introduced by the State, #33-36. Prior to trial, the defense moved to exclude 30 crime scene and autopsy photographs, asserting that they were gruesome and unduly prejudicial. The trial court addressed the motion at a hearing on July 19, 2016, and again on August 3, 2016, and ultimately deemed 19 of the photographs admissible.

The photographs at issue were introduced during the testimony of Deputy Stevens. State's Exhibit #26 was introduced to show the condition of the body as it was found after it had been pulled out of the ravine. State's Exhibit #32 was shown to show the "beginnings" of where the exit wound was, just below the victim's goatee, and #33 was a better depiction of what was shown in #32. State's

16

Exhibit #34 was a similar view also showing the victim's red shirt with tassels hanging from the sleeve. A picture of the shirt the victim was wearing had been provided to law enforcement by the victim's family and was a factor in identifying the victim. State's Exhibit #35 was a similar picture, and #36 was a closer picture of the exit wound. State's Exhibit #37 was like State's Exhibit #26 but after the rope had been removed from the victim's ankles.

In *State v. Brown*, 18-1999, pp. 52-54 (La. 9/30/21), 330 So.3d 199, 244, *cert. denied*, __ U.S. __, 142 S.Ct. 1702 (2022), the supreme court addressed a claim of improper admission of postmortem photographs, including the standard of review:

> Defendant argues that the trial court erred in allowing the State to admit these photographs, contending they were irrelevant because he did not dispute the manner or cause of death, nor did he dispute that an arson had occurred. He also did not dispute that two victims were nude from the waist down when they were discovered, or that the victims were intentionally stabbed. Defendant argues that while he contested the allegation that Gabriela Nieves had been raped, as discussed in Assignment of Error No. 14, *infra*, a close-up photograph of her genitalia that was shown to the jurors could not have reasonably aided their determination of this issue. He further asserts that because the pathologist prepared contemporaneous diagrams of the wounds of each victim, the photographic evidence was unnecessary and served no purpose other than to inflame the jurors.
>
> Even when the cause of death is not at issue, the State is entitled to the moral force of its evidence, and postmortem photographs of murder victims are generally admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, location, placement of wounds, or positive identification of the victim. *State v. Letulier*, 97-1360, pp. 17-19 (La. 7/8/98), 750 So.2d 784, 794-95; *State v. Robertson*, 97-0177, p. 29 (La. 3/4/98), 712 So.2d 8, 32; *State v. Koon*, 96-1208, p. 34 (La. 5/20/97), 704 So.2d 756, 776; *State v. Maxie*, 93-2158, p. 11 n.8 (La. 4/10/95), 653 So.2d 526, 532. Photographic evidence will be admitted unless it is so gruesome as to overwhelm the reason of the jurors and lead them to convict the defendant without sufficient evidence: specifically, when the prejudicial effect of the photographs substantially outweighs their probative value. *State v. Broaden*, 99-2124, p. 23 (La. 2/21/01), 780 So.2d 349, 364 (citing *State v. Martin*, 93-0285, pp. 14-15 (La. 10/17/94), 645 So.2d 190, 198); *State v. Perry*, 502 So.2d 543, 558-59 (La. 1986).

The photographs taken outside of the crime scene show the deceased bodies of a woman and two small children, each with multiple stab wounds, covered in soot, and partially undressed. The photographs taken during the autopsies show close-up images of wounds, including those to the genitalia of a woman and a small child. We find that while the photographs are graphic and disturbing, given the strength of the evidence against defendant, it is unlikely the jurors found him guilty based on any inflammatory nature of the photographs. *See State v. Holliday*, 17-1921, p. 72 (La. 1/29/20), —— So.3d —— (finding no error in the trial court's admission of autopsy photographs of the child victim, given the strength of the evidence against him). Consequently, defendant fails to show reversible error in this regard.

The photographs at issue in this case depicted the victim's body as it was found at the scene. They showed the clothing the victim was wearing on the night of the incident (which matched the description and photograph provided by his family) as well as several views of the exit wound near his chin. The photographs are not "so gruesome as to overwhelm the reason of the jurors and lead them to convict the defendant without sufficient evidence[.]" *Id.* at 244. Accordingly, this assignment of error has no merit.

## ASSIGNMENT OF ERROR NUMBER FOUR

The defendant contends the trial court erred in allowing the state to support the credibility of its witness, Jimmy Lewis, before it had been attacked by defense counsel. When Mr. Lewis took the stand, the state first asked about his conviction and sentence for the victim's murder. Shortly thereafter, when the questioning turned to Mr. Lewis' previous convictions, defense counsel objected on the ground of the improper bolstering of the witness's credibility. The state responded that it was not bolstering the credibility of its witness rather, it was attacking his credibility.

Louisiana Code of Evidence Article 607 states, in pertinent part:

**A. Who may attack credibility.** The credibility of a witness may be attacked by any party, including the party calling him.

18

**B. Time for attacking and supporting credibility.** The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked. However, a party may question any witness as to his relationship to the parties, interest in the lawsuit, or capacity to perceive or to recollect.

**C. Attacking credibility intrinsically.** Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.

Louisiana Code of Evidence Article 609.1 provides, in pertinent part:

**A. General criminal rule.** In a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations set forth below.

**B. Convictions.** Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.

**C. Details of convictions.** Ordinarily, only the fact of a conviction, the name of the offense, the date thereof, and the sentence imposed is admissible. However, details of the offense may become admissible to show the true nature of the offense:

(1) When the witness has denied the conviction or denied recollection thereof;

(2) When the witness has testified to exculpatory facts or circumstances surrounding the conviction; or

(3) When the probative value thereof outweighs the danger of unfair prejudice, confusion of the issues, or misleading the jury.

The defendant does not explain how the state's questioning of Mr. Lewis regarding his prior convictions and sentences bolstered his credibility. The cases relied upon by the defendant, *State v. J.E.*, 19-478 (La.App. 5 Cir. 9/2/20), 301 So.3d 1262, *writs denied*, 20-1227, 20-1131 (La. 2/9/21), 310 So.3d 175, 182, *cert. denied*, __ U.S. __, 141 S.Ct. 2831 (2021), and *State v. Anthony*, 17-372 (La.App. 5 Cir. 12/30/20), 309 So.3d 912, *writ denied*, 21-176 (La. 10/12/21), 325 So.3d

1067, *cert. denied*, __ U.S. __, 143 S.Ct. 29 (2022), do not address the situation presented in this case. The questioning regarding Mr. Lewis' prior convictions was permissible, and the trial court did not err in so ruling. Accordingly, this assignment of error has no merit.

### ASSIGNMENT OF ERROR NUMBER FIVE

The defendant contends the trial court erred in denying the challenge for cause of potential juror Barbara Neal due to her COVID-19 concerns. During voir dire examination, prospective jurors were asked if their service on the jury would create a hardship. Ms. Neal and defense counsel had the following exchange:

**MS. NEAL:**

I don't have anything that would keep me from being here except for I do have concerns about the - - our - - our health being here, being this close. And, is this all the trial's going to be and are we going to be sitting in this fashion? And is this - -

**MR. JOHNSON:**

I think - - I think so. Yes. So, you have a concern about that, as well as, - -

**MS. NEAL:**

Definitely, because it should be six foot away from each other, and everyone should have their mask on, with their nose covered.

**MR. JOHNSON:**

All right. I - - I think he heard you on that, as well. Anybody else? Okay. All right. I talked a lot but I'm trying to - - to wrap it up. If you were my client, Ms. Neal, would you be comfortable with you being the juror in your case? If you were sitting at that table with me but you have an outer body experience and then, you're over there but you're over there, too. Kind of like a Star Trek episode a long time ago. Could you be - - would you be comfortable with yourself being a juror on your case?

**MS. NEAL:**

Yes.

The defense challenged Ms. Neal for cause, and the state's position was that Ms. Neal's concerns did not rise to the level of a challenge for cause as everyone was concerned about COVID. The court denied the challenge, and the defense exercised a peremptory challenge to excuse her.

In support of his position, the defendant contends Ms. Neal was not sufficiently rehabilitated to alleviate her health concerns. Louisiana Code of Criminal Procedure Article 797 provides:

> The state or the defendant may challenge a juror for cause on the ground that:
>
> (1) The juror lacks a qualification required by law;
>
> (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
>
> (3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
>
> (4) The juror will not accept the law as given to him by the court; or
>
> (5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.

In *State v. Berry*, 95-1610, pp. 4-5 (La.App. 1 Cir. 11/8/96), 684 So.2d 439, 447-48, *writ denied*, 97-278 (La. 10/10/97), 703 So.2d 603, the court addressed the trial court's denial of a challenge for cause where the potential juror was concerned that she may suffer a migraine headache during her service:

> A trial court is vested with great discretion in ruling on challenges for cause, and that ruling will not be disturbed unless a review of the voir dire as a whole indicates an abuse of that discretion. *State v. McLean*, 525 So.2d 1251, 1254 (La.App. 1st Cir.), *writ denied,* 532 So.2d 130 (La.1988). La.Code Crim. P. art. 797 provides

in pertinent part that a juror may be excused for cause when the juror is not impartial, whatever the cause of his partiality; an opinion or impression as to the guilt or innocence of the defendant is not of itself sufficient ground of challenge to a juror if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and evidence. . . .

The defense sought to challenge Ms. Thomas for cause based upon defense counsel's impression that she was bored and unconcerned with the proceedings. However, Ms. Thomas expressed only a concern that her service might be interrupted by a migraine headache, to which she is occasionally subject. Nothing in her voir dire testimony indicates any unwillingness to be a fair, impartial and attentive juror, and any illness she might have experienced would have been covered by the presence of an alternate juror.

After reviewing the testimony of Mr. Williams, Ms. Bissell and Ms. Thomas, along with the voir dire as a whole, it is evident that the trial court did not abuse its discretion. The testimony of these potential jurors indicates that they were willing to apply the law as given by the trial court and would be fair and impartial. Under these circumstances, we conclude that the trial court correctly denied Berry's challenges for cause. Consequently, these assignments of error are without merit.

As noted above, a trial court is vested with great discretion in ruling on challenges for cause, and that ruling will not be disturbed unless a review of the voir dire as a whole indicates the trial court abused its discretion. A review of the voir dire of Ms. Neal indicates that she had not heard about the case, that she stated she could uphold the law, and that if the elements of the crime were not proven beyond a reasonable doubt, the defendant would be innocent. When defense counsel asked whether any of the prospective jurors would give a police officer's testimony more credibility than the "average Joe Blow," Ms. Neal responded, "I'm going to expect that whenever someone takes an oath that they're going to tell the truth and they'll be telling me the truth," no matter who it was. Although Ms. Neal indicated she knew of two of the potential witnesses, she stated that if they testified, she would not give their testimony more weight than anyone else's. There is nothing in Ms. Neal's voir dire testimony indicating she was unwilling to be a fair, impartial, and attentive juror. Under the circumstances presented, the

trial court did not err in denying defense counsel's challenge for cause to this prospective juror, and this assignment of error has no merit.

**CONCLUSION**

The defendant's conviction and sentence are affirmed.

**AFFIRMED.**